**ACHESON, Secretary of State v.
MURAKAMI et al.**

No. 12082.

United States Court of Appeals
Ninth Circuit.

Aug. 26, 1949.

H. G. Morison, Asst. Atty. Gen., James M. Carter, U. S. Atty., Ernest A. Tolin, Asst. U. S. Atty., Los Angeles, Cal., Enoch E. Ellison, Sp. Asst. to Atty. Gen., Bonnell Phillips and Paul J. Grumbly, Attys. Dept. of Justice, Washington, D. C., for appellant.

A. L. Wirin and Fred Okrand, Los Angeles, Cal. (Nanette Dembitz, Arthur Garfield Hays and Osmond K. Fraenkel, New York City, Frank F. Chuman, Los Angeles, Cal., of counsel), for appellees.

Before DENMAN, Chief Judge, and STEPHENS and ORR, Circuit Judges.

DENMAN, Chief Judge.

The Secretary of State appeals from a judgment cancelling the renunciations of citizenship by appellees, American born of Japanese descent, made while incarcerated at Tule Lake. The district court found that the renunciations were "not as a result of their free and intelligent choice but rather because of mental fear, intimidation and coercions depriving them of the free exercise of their will, [and] said purported renunciations are void and of no force or effect."

The complaint alleged that appellees, at dates in and between December, 1944, and March, 1945, applied to renounce their citizenship under the provisions of Section 401 of the Nationality Act of 1940, as amended, 8 U.S.C.A. § 801(i), and that the applications were granted; that the renunciations were null and void and should be cancelled for the reasons found by the court; that in 1948 they duly applied for passports and that officers of the State Department had refused to issue passports to them on the sole ground that appellees were no longer citizens or nationals of the United States by reason of the aforesaid renunciations of United States nationality. The court had

jurisdiction under 8 U.S.C.A. § 903 (R.3). The answer raised as the sole issue the existence of mental fear, intimidation and coercion as the cause of the renunciations.

The findings of probative facts of District Judge Mathes vividly showing the conditions prevailing at Tule Lake Center are contained in Exhibit (1) attached to and made a part of this opinion. We agree that each of these findings is supported by the evidence.

Underlying all the particular factors so found as leading to a condition of mind and spirit of the American citizens imprisoned at Tule Lake Center, which make the renunciations of citizenship not the free and intelligent choice of appellees, is the unnecessarily cruel and inhuman treatment of these citizens (a) in the manner of their deportation for imprisonment [1] and (b) in their incarceration for over two and a half years under conditions in major respects as degrading as those of a penitentiary and in important respects worse than in any federal penitentiary, and (c) in applying to them the Nazi-like doctrine of inherited racial enmity, stated by the Commanding General ordering the deportations as the major reason for that action.

Since the records of this court show the government is contesting some four thousand similar cases of deportees who are seeking identical relief, we are giving consideration to these uncontested underlying facts, certain to have their effect upon the minds of the mass of deportees incarcerated at Tule Lake.

In considering the effect of the government's treatment on the minds of our deported fellow citizens, those litigating here and many others found to be loyal Americans, it must be remembered how highly educated are the Nisei, the 70,000 native born Japanese. According to the Army's statistical division, Bulletin 11 of March 15, 1943, the educational level of the Nisei exceeded that of the native whites of native parentage in the four Western States. It is not surprising that such eminent educators as Robert Gordon Sproul, President of the University of California, protested the Nisei deportations and the De Witt doctrine of inherited racial enmity, later discussed.

A. The racial deportation. Its unnecessary hardships and cruelty as affecting the attitude of scores of thousands of loyal Americans towards their citizenship in a country so ordering them into imprisonment.

Typical of the deportation orders under which the citizen prisoners of the Tule Lake Center were ordered from their homes to their first barbed wire guarded stockades, euphemistically called Assembly Centers, is Civilian Exclusion Order No. 34 of Major General De Witt of Sunday, May 3, 1942. This required them to be so incarcerated not later than noon of Saturday, May 9, 1942.

What these citizens, their families in a single group, and individual men, women and children and babies were commanded to do in this brief period, less than five days to those not receiving the notice before Monday noon, is as follows:

"The Following Instructions Must Be Observed:

"1. A responsible member of each family, preferably the head of the family, or the person in whose name most of the property is held, and each individual living alone, will report to the Civil Control Station to receive further instructions. This must be done between 8:00 a. m. and 5:00 p. m. on *Monday, May 4, 1942,* or between 8:00 a. m. and 5:00 p. m. on *Tuesday, May 5, 1942.*

"2. Evacuees must carry with them *on departure for the Assembly Center,* the following property:

"(a) Bedding and linens (no mattress) for each member of the family;

---

[1] This case is not concerned with the validity of the relocation orders, first stated to be valid in Judge Denman's dissent to the certification of Hirabayashi v. United States, reported in 140 F.2d at page 300, and later held valid in Korematsu v. United States, 9 Cir., 140 F.2d 289, 291 and by the Supreme Court in 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194.

"(b) Toilet articles for each member of the family;

"(c) Extra clothing for each member of the family;

"(d) Sufficient knives, forks, spoons, plates, bowls and cups for each member of the family;

"(e) Essential personal effects for each member of the family.

"All items carried will be securely packaged, tied and plainly marked with the name of the owner and numbered in accordance with instructions obtained at the Civil Control Station. *The size and number of packages is limited to that which can be carried by the individual or family group.*

"3. No pets of any kind will be permitted.

"4. No personal items and no household goods *will be shipped* to the Assembly Center.

"5. The United States Government through its agencies will provide for the storage *at the sole risk of the owner* of the more substantial household items, such as iceboxes, washing machines, pianos and other heavy furniture. Cooking utensils and other small items will be accepted for storage if crated, packed and plainly marked with the name and address of the owner. *Only one name and address will be used by a given family."* (Emphasis supplied.)

One has no difficulty imagining the thousands of families in which the mother must carry the babies, measuring the carrying capacity of each of the other children able to walk against the sacrifice of one or another household utensil, or book, or family treasure.

The emotion of free citizens contemplating the pathetic testing of the carrying capacity of stumbling infants lifting their bundles is not pertinent here. What is pertinent is what our incarcerated fellow citizens felt about it in their several years behind barbed wire under the machine guns of the soldiers in their prison's turrets. For, so far as concerns the psychology of the renunciations to those renouncing and their surrounding companions, the beguiling words "evacuation" meant deportation, "evacuees" meant prisoners, "relocation center" meant prison and their single rooms, some crowding in six persons, meant cells, as they in fact were. Their true character is recognized in this opinion.

The stowage of the remainder of the family possessions, it will be noted, is "at the sole risk of the owner." So also it was of the stock in trade of thousands of small merchants, the agricultural tools of the thousands of farmers, the professional books and instruments of lawyers and doctors. For many no storage places were provided by General De Witt, though it is apparent that two months earlier he contemplated the deportation. It is obvious that storage warehouses available for all such properties of the 110,000-odd deportees did not exist.

The inevitable followed, after the meaning of the De Witt orders was understood. Unscrupulous secondhand dealers bought family possessions for a song. One can picture a widow bargaining for the family bedstead and kitchen stove while measuring the carrying capacity and load of her infants. Nor can one fail to apprehend the bitter sense of frustration of a doctor or lawyer at the loss of a long built up practice or that of the farmer trying to sell his partially matured crop, the result of years of soil improvement, to avid buyers who know the seller is but two or three days from his stockade.

Finally, one has no difficulty in realizing the repeated recitals of such wrongs in the crowded dust filled halls and cells of the Tule Lake Center and their effect upon the psychology of those there contemplating the value of an American citizenship.

B. The incarceration at the Tule Lake stockade. Its effect upon the minds of our fellow citizens as to the value of their citizenship.

The barbed wire stockade surrounding the 18,000 people there was like that of the prison camps of the Germans. There were the same turrets for the soldiers and the same machine guns for those who might at-

tempt to climb the high wiring. How closely packed they were is shown by the following photograph of the United States Army Signal Corps in evidence.

by the occupants to whom scant material was furnished after long delay. No federal penitentiary so treats its adult prisoners. Here were the children and babies as well.

The armed turrets are the spots which appear at the two lower corners and elsewhere on the surrounding stockade, though faintly appearing in upper portion of the reproduction. The imprisoning buildings shown were constructed in part by the citizens who were to occupy them, alongside free carpenters, painters and plumbers. As if to drive it in to their already shocked spirits that their treatment was to be like criminals in a penitentiary, they were paid the prison wage of $12 *a month* to the unskilled and $16 to those skilled, while their free fellow citizens, working beside them, were paid the prevailing $12 to $20 *per day* of their respective trades.

The buildings were covered with tarred paper over green and shrinking shiplap—this for the low winter temperatures of the high elevation of Tule Lake. What further was done to shut out the winter cold·was

None of the living rooms had running water, much less toilet facilities. Instead there were outside communal latrines shared alike by the gentle bred college girl and by the prostitute. To reach the unheated latrines, which were in the center of the blocks of fourteen buildings, meant leaving the residential shacks and walking through the rain and snow—again a lower than penitentiary treatment, even disregarding the sick and the children.

So, also was the crowding of the 18,000 people in the one-story shacks, all in an area of 1¼ square miles. Apartments 20 by 25 feet were assigned to a group of 6 members; 20 by 20 to groups of 3 to 5 members; and 12 by 20 to groups of 2 to 4 members, often without reference to sex, age, or closeness of relationship. In the cells of a federal penitentiary there is no such crowding.

The comparatively wide spacing of the streets in the photographs, supra, was for fire protection, not sanitation. On the contrary, the streets were unpaved. Their dust added to the dust clouds of the surrounding country, devoid of vegetation to hold down the soil, was raised by a breeze of any strength and sifted in through the cracks in the shacks' walls. As a visiting Congressman said, "On dusty days one might just as well be outside as in."

Also lower than many penitentiaries was the absence of any occupation for a normally active industrious people of high intelligence. True, some of them farmed adjoining land on a 48-hour week at $16 per month, among white farmers paid the prevailing California wage. Here they were not permitted to feel they were making the citizens' contribution to public welfare. The farm product was insufficient for their own needs.

The sole money contribution of the government for its forced unemployment of its citizens is a so-called "unemployment compensation" of *$4.25 to $4.75 per month*. This against such compensation for free fellow citizens based upon their going wage, amounting in California to *$20 per week*.

C. General De Witt's doctrine of enemy racism inherited by blood strain. Its paramount effect on the minds of the imprisoned citizens.[1a]

The major reason for General De Witt's deportation orders is his belief that these citizens, descended of an eastern Asiatic race, can never be determined to be loyal Americans. His statements of this doctrine are as follows:

"A Jap is a Jap."[2] "It makes no difference whether he is an American citizen or not he is still a Japanese * * * The Japanese race is an enemy race and while many second and third generation Japanese born on United States soil, possessed of United States citizenship, have become 'Americanized,' the racial strains are undiluted."[3] "But we must worry about the Japanese all the time until he is wiped off the map. Sabotage and espionage will make problems as long as he is allowed in this area."[4] (Emphasis supplied.)

General De Witt's belief in his doctrine was clearly apparent to the Nisei. Most alarming stories were circulated concerning assistance to the Japanese attack on Pearl Harbor of the people of Japanese blood strain in the Hawaiian Islands. The Army high command knew all these stories were false. It knew that no act of sabotage was committed in Hawaii, with over 35% of its population of such blood strain,[4a] or in the area of the Western Defense Command in the months between Pearl Harbor and the deportation in that Command. However, De Witt was so certain that a race of such enemy blood strain *must* commit sabotage that he stated: "The very fact that no sabotage has taken place to date is a disturbing and confirming indication that such action will be taken."

Here was high authority to inflame the existing anti-Japanese sentiment of some of the people of the Pacific Coast, for General De Witt had been awarded the Distinguished Service Medal and membership in France's Legion of Honor for services as staff supply officer in the first world war.

---

[1a] It is irrelevant to the issues here that students of racial origins are agreed that such a doctrine of enmity to some government inherited through racial strains is an anthropological absurdity. Cluckhohn Mirror for Man, p. 102.

[2] The Spoilage, p. 20, by Thomas and Nishimoto, admitted in evidence.

[3] Final Report, Western Defense Command, p. 34.

[4] House Naval Affairs Com. Report, Part 3, pp. 739–740, 78th Cong. 1st Session.

[4a] "War Department
"Washington, March 30, 1942.
"Hon. John H. Tolan
"House of Representatives,
"Washington, D. C.
"Dear Mr. Tolan: Reference is made to your letter of March 19, 1942, requesting a statement regarding sabotage activities in Hawaii.
"The War Department has received no information of sabotage, committed by Japanese during the attack on Pearl Harbor.
"Sincerely yours,
"Henry L. Stimson,
"Secretary of War."

Also such distinction made more bitter the shock and resentment of the Nisei and their fear of violence and even murder if they returned to their homes on the Pacific Coast.

The identity of this doctrine with that of the Hitler generals towards those having blood strains of a western Asiatic race as justifying the gas chambers of Dachau must have been realized by the educated Tule Lake prisoners of Japanese blood strain. The German mob's cry of "der Jude" and "the Jap is a Jap" to be "wiped off the map" have a not remote relationship in the minds of scores of thousands of Nisei, whose constant loyalty has at last been recognized,[4b] though the map referred to may have been the area of exclusion.

Hence one would expect to find, as the record shows, a high spirited Nisei saying of the imprisonment with him of Nisei soldiers serving in our armies in the first world war and of his reasons for renouncing his citizenship:

"War and evacuation forced us *American citizens* to leave *everything* we had worked and slaved for. Yes, we were bitter, can you blame us?

"My American friends * * * no doubt must have wondered why I renounced my citizenship. This decision was not that of today or yesterday. It takes back to the day when General De Witt ordered evacuation. It was confirmed when he flatly refused to listen even to the voices of the former World War Veterans and it was doubly confirmed when I entered Manzanar. We who already had proven our loyalty by serving in the last World War should have been spared. The veterans asked for special consideration but their requests were denied. They too had to evacuate like the rest of the Japanese people, as if they were aliens.

"I did not expect this of the Army. When the Western Defense Command assumed the, responsibilities of the West Coast, I expected that at least the Nisei would be allowed to remain. But to General De Witt, we were all alike. 'A Jap's a Jap. Once a Jap, always a Jap.' * * * I swore to become a Jap 100 percent, and never do another day's work to help this country fight this war. My decision to renounce my citizenship there and then was absolute.

"* * * I did not want to be greedy enough to keep my United States citizenship and use it when necessary—when necessity claimed me. Since I was disloyal to the United States I wanted to be honest about it." [5]

Such men, for the time so driven to a pro-Japanese attitude, found in Tule Lake the Kibei, many permanently pro Japanese. They were the American born but educated in Japan. From the latter group and the disaffected Nisei came the powerful organization of pro Japanese there with their bitter opposition to the loyal Nisei, leading to the fighting, beatings and reputed murder of loyal Americans described in succeeding findings 12, 13, 18, 22, 27, 44, 45 and 46, made a part of this opinion.

Fear of reprisal if one failed to renounce his citizenship was for some the final pressure causing such renunciations. Such violence continuing over a year is another of the worse than penitentiary conditions considered supra.

Others feared such violence as of the German mobs if they returned to their homes after they were free to do so. After the return from the stockades of some of the imprisoned men and women to their homes following the decision of the Supreme Court is Ex parte Mitsuye Endo, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243, there

---

4b This doctrine was not accepted by the officers of the Hawaiian command. With a Japanese population of over 35%, against 2% in the Pacific states, they enlisted several thousand Nisei. Because Assistant Secretary of War McCloy pressed for it some California Nisei also were permitted to enlist. The falsity of the doctrine is shown by their service in Italy, where they had the highest percentage of decorations for exceptional courage and the largest percentage of killed and wounded of any of the American troops.

5 The Spoilage, pp. 348–49.

were such incidents reported in the press read by the interned men as:

"[In Caldwell, Idaho] three ruffians, accompanied by seventeen or eighteen persons, attacked three Nisei soldiers and their friends and relatives, who numbered about forty persons * * * at 1:30 a. m. [January 7, 1945], while they were waiting for a train * * * They rushed into the waiting room and socked a Nisei soldier * * * who was standing at the entrance. The attackers shouted obscene words, and some of them said, 'God damned Japs! I'm gonna kill all.' They beat the Japanese at random and created a scene of utter confusion.[6]

"[In Wells, Nevada], angered by the refusal of a loan of cash, a Caucasian, working for a railroad, shot and seriously injured three Japanese on January 20.[7]

"Efforts to blow up the packing shed of a returned Japanese-American farmer with dynamite and to intimidate him and his family with gunshots were disclosed yesterday by Sheriff Charles Silva of Placer County.[8]

"[Sumio] Doi, who returned to his place near Newcastle recently from Lamar, Colo., with his parents, called the sheriff's office early yesterday to report that several carloads of persons had parked on his property. Shots were being fired at the house, he said, in an effort to keep him and his family indoors."[8]

This and similar reports were distorted by rumor, and fears about the reception awaiting returnees increased, leading to such statements as:

"Rumor is being circulated that five Japanese were killed in Fresno.

"People are saying that some Japanese were killed around Stockton [California]. Reading the papers and considering all other facts, the people have a feeling of not wanting to return to the Pacific Coast, even though the exclusion orders were lifted. California is not exactly dangerous, but still, it's not favorable to the Japanese.

"California is the last place I'd want to go back to, with all I've been reading. They say the Army will back us up. But that's only against mob violence, and not against what an individual might do. If some person beats us up, we can't do anything about it.

"What do they want us to do? Go back to California and get filled full of lead? I'm going to sit here and watch."[9]

"The rumors were that we would be forced out of here; whereas, the people outside would take arms and harm us * * * As I am alone here, I was upset * * * The columns in the San Francisco newspapers spoke of violence displayed toward the returning evacuee.

"Everybody told me that I must renounce my citizenship of the United States, otherwise I will be forced to go outside of the camp to be murdered. Believe me, Sir, honest, I was scared and I applied for renouncement."[10]

The above facts in evidence add to our conclusion that the ultimate fact found of renunciation because of mental fear, intimidation and coercion necessarily follows from the probative facts in the succeeding exhibit (1).

We hold not only that the Secretary of State has not maintained his burden under Federal Rules of Civil Procedure, rule 52, 28 U.S.C.A., to show that the findings are clearly erroneous, but that it would have been clear error had the district court held otherwise.

The judgment holding the appellees' renunciations are null, void and cancelled and ordering the Secretary of State to treat appellees as citizens of the United States is affirmed.

[6] Rocky Shimpo, Japanese Section, January 24, 1945, The Spoilage, p. 346.

[7] Colorado Times, Japanese Section, January 27, 1945, The Spoilage, p. 347.

[8] San Francisco Chronicle, January 20, 1945. The Doi case was also sensationally reported in the vernacular press. The Spoilage, p. 347.

[9] The Spoilage, pp. 346–47.

[10] The Spoilage, p. 349.

Judge STEPHENS did not participate in the decision of this case.

## Exhibit (1)

[Title of District Court and Cause]

### Findings of Fact and Conclusions of Law

The above entitled cause came on regularly for trial on *on* August 20, 1948, in the courtroom of the Honorable William C. Mathes, Judge, presiding without a jury, no jury having been requested, A. L. Wirin, Fred Okrand, and Frank Chuman by A. L. Wirin, appearing as attorney for plaintiffs, and James M. Carter and Ernest A. Tolin by Ernest A. Tolin, appearing as attorney for defendant, and evidence having been introduced on behalf of all parties, and the Court having considered the same and heard the arguments of counsel and being fully advised, makes the following:

### Findings of Fact.

\*   \*   \*   \*   \*   \*

8. Each of the plaintiffs was found by the War Relocation Authority to be free of any suspicion of disloyalty to the United States.

9. In January 1942, great anti-Japanese agitation was aroused, proposing that all persons of Japanese ancestry should be evacuated from the West Coast of the United States. The agitation resulted in the ultimate removal from this area by military authorities of all persons of Japanese ancestry whether alien or citizen of the United States.

10. In February 1942, approximately six hundred (600) males of Japanese ancestry who theretofore had been serving in the United States Army, either by way of induction or enlistment, had been honorably discharged from the United States Army or transferred to the Reserves. The certificates of honorable discharge gave as the reason for discharge, for the convenience of the Government. Commencing in March through the spring of 1942, one hundred and ten thousand (110,000) persons of Japanese ancestry, both citizens and aliens alike, were removed from the Western Defense Command composing [38] all the Pacific Coast states into assembly centers and later into relocation centers. Such evacuation was felt by these persons to be proof that they were persona non grata to the American public and to the United States Government. In a matter of a few short weeks, a lifetime of savings had been lost. They had lost their homes and friends. They had been forced to liquidate, give away, or abandon their farm equipment, merchandise, and such other valuable and personal property that they had.

11. In the Spring of 1943, the War Relocation Authority, under which persons of Japanese ancestry had been placed under military guard in the relocation centers, encountered unfavorable publicity in the press. A subcommittee of the House Select Committee to Investigate Un-American Activities conducted an investigation into the policies of the War Relocation Authority and recommended segregation of those whom it deemed disloyal to the United States from those it deemed loyal. The preparation for this segregation process was carried on in the spring and summer of 1943. The Tule Lake Relocation Center was designated as the depository for "disloyal" Japanese. Over 6,000 American citizens of Japanese ancestry stigmatized as disloyal entered the Tule Lake Center in September and October of 1943 under this segregation program. Some 6,000 residents of Tule Lake who refused to move to another relocation center were also present in the center. Other persons included women and children. Children loyal to the United States were allowed to accompany segregee parents. Parents who were aliens loyal to the United States were allowed to accompany segregee children.

Several reasons were prominent as to why the evacuees decided to become segregants and to assume the status of individuals disloyal to the United States. They included (a) fear of being forced to leave the centers and face a hostile American public; (b) concern for the security of their families; (c) fear on the part of evacuee parents that their sons would be drafted if the sons did [39] not become segregees; (d) anger and disillusionment, owing to the abrogation of citizenship rights; (e) bitterness over economic losses brought about by the evacuation. A great

many of the people at Tule Lake under the segregation program also regarded it as a place of refuge where they might remain for the duration of the war.

The final count under the segregation program was eighteen thousand (18,000) persons. They were placed in the Tule Lake Center in an area of six square miles of black volcanic ash and were forced to live in uncomfortable, black tar-paper barracks under a pall of black smoke in the winter and ash and dust in the summer. The 18,000 people within the confines of barbed-wire enclosure comprised a conglomerate community of persons from all walks of life living in close proximity with one another, not by reason of freedom of choice but under a predetermined program prescribed for them by the Government. There was no normal living to be found. Families from isolated rural communities were flanked by strange families from urban communities. Fishermen from Terminal Island, farmers from Central California, merchants from Seattle, Portland, San Francisco, Los Angeles, lawyers, doctors, and other professional persons and scholars, and even the gamblers, prostitutes, and criminals were co-mingled into this community. They lived in crowded, dismal barracks, ate unpalatable food of the mess halls, lacked privacy in community lavatories and laundry rooms, and lived in a constant atmosphere of a concentration camp of dead monotony.

The segregation program brought together persons who honestly felt an allegiance to Japan and the Japanese Emperor, but it also brought the trouble-makers, the malcontents, the fractious, the rebellious and frustrated, the draft-dodgers, the fanatics, the social misfits, the professional "organizers," the party politicians, the political leaders and their gangs of "goons" and "strong arm" boys.

12. On November 1, 1943, there was a demonstration by the [40] residents of Tule Lake Center against Dillon Myer, the Director of the War Relocation Authority. The leader of the representative body composed of Japanese residents engineered a mass demonstration. The behavior of this crowd was orderly. On the same day, however, a group of young Japanese entered the center hospital and attacked and severely beat the Caucasian chief medical officer who was unpopular with the Japanese residents.

13. On November 4, 1943, a fight broke out between the Caucasian War Relocation Authority Internal Security force (police department of the center) and a group of young Japanese men. Immediately thereafter the military assumed control of the center to prevent further demonstrations and attacks upon Caucasian personnel. The leaders of this mob action were placed within a barbed-wire stockade which had been constructed in the center.

14. From November 13, 1943, until January 24, 1944, the military completely controlled the Tule Lake Center under a declared condition of martial law.

15. On January 24, 1944, the Army returned Tule Lake Center to the control of the War Relocation Authority. The Army, however, still held some three hundred and seventy-five (375) Japanese men as prisoners in the barbed-wire stockade, including all the members of the self-constituted "negotiating committee" which had engineered the meeting with Mr. Dillon Myer on November 1, 1943.

16. In the spring of 1944, it was becoming more and more evident on the part of Caucasian and Japanese residents that there existed a strong underground pressure group composed mostly of fanatic Japanese aliens and those persons of Japanese ancestry whose sympathies lay with the Japanese Government. This underground group was considerably strengthened by the arrival of certain parolees from Santa Fe Alien Internment Camp, a camp operated by the Department of Justice for those whom it had apprehended as Japanese whose presence in the Western Defense Command at the outbreak of the war [41] between Japan and the United States on December 7, 1941, was inimical to the national defense. Powerful gang leaders accompanied these groups of parolees.

17. In the spring of 1944 soon after the arrival of this group of parolees or in April 1944, the underground group emerged

and adopted the name Saikakuri Seigan (literal translation: "Appeal for Resegregation"). This resegregation group was also known as the Sokuji Kikoku Hoshi-dan whose membership was composed of families, adult aliens, citizens, and minor children.

18. Later in 1944, the Hoshi-dan sponsored an auxiliary body for young men. This was called the Young Men's Fatherland Group. It was also called the Sokoku Kenkyu Seinan-dan and the Hokoku Seinen-dan. Most of the members were citizens of the United States. These organizations were intimately related and many or most of the members of the Young Men's Fatherland Group were members of the resegregation group. The older men, i. e., the Issei, advised the Young Men's Fatherland Group and formed most of the policies of the young organization. It was the avowed purpose of the resegregation group to set up activities to keep the center in a state of turmoil. A series of assaults were added to the tension. Certain men who had openly criticized the activities of the resegregation group were attacked at night and severely beaten. Several of the beatings were engineered by the alleged gang leaders. None of the assailants were apprehended by the police. In the Tule Lake Center, seven men alleged to be "inus" were beaten. There was an extraordinarily powerful evacuee fear of being considered an "inu" or "stool pigeon." The "inu" phenomenon was a potent means of social control in all the centers. In Tule Lake, it played a significant part in sociological developments which preceded renunciation of citizenship. It was largely responsible for the fact that terrorists and persons guilty of violent assault were not denounced to the authority. [42]

19. On July 1, 1944, Subsection (i) of 401 of the Nationality Act authorizing renunciation of American citizenship under certain expressed circumstances was added to the Nationality Code of 1940. The proposal that American citizens should be permitted in time of war to renounce their citizenship was made for the purpose of devising a system of controlling the disloyal and riotous element at Tule Lake by separating them through renunciation of their American citizenship into enemy aliens for control and detention by the Department of Justice.

20. On July 3, 1944, Mr. Hitomi, the General Manager of the Cooperative and an alleged "inu," was found in front of an apartment of his relative with his throat cut. The remaining members of the Cooperative's Board of Directors received anonymous communications that they would meet the same violent end if they did not cease their opposition to the pro-Japanese association. The Japanese members of the Board resigned in a body. All Japanese members of the Internal Security also resigned and sought shelter for their families and themselves on the Caucasian side of the fence. The residents of the center were frightened for weeks. A period of extreme community tension and fear followed the murder of Mr. Hitomi. This murder set a pattern of violence over and above the ordinary beatings which took place from time to time, over and above the daily threats and intimidations which the organized minority used to dominate the unorganized majority. If Mr. Hitomi was killed for some reason or for no reason at all, the residents were in constant fear that the same thing would happen to them.

21. On July 13, 1944, the Tule Lake project newspaper, The Newell Star, published a statement explaining that the Congress of the United States had passed a law which provided that a citizen of the United States might make a formal written renunciation of nationality.

22. On August 12, 1944, the resegregation group leaders [43] organized a young men's group ostensibly devoted to the study of Japanese history and culture called the Sokoku Kenkyu Seinen-dan or the Young Men's Fatherland Group. This new group was fostered and developed by subversive leaders who organized "goon" squads or "strong arm" boys to execute their orders. In a high-powered membership drive and with the use of every kind of deception, intimidation, and threat, the membership boomed. Many people, both young and old, were forced to join this subversive organization against their will.

Men were forced to shave their heads. The Americanized girls were coerced into membership and then to wear their hair in "pig tails."

23. On September 24, 1944, a petition was circulated by this subversive group for renunciation by American citizens of their citizenship. This petition for renunciation was circulated without the permission of the War Relocation Authority. Pressure was exerted upon the residents who would not sign such a petition. A substantial majority of the residents disapproved of this petition and further resented the social pressure applied by its circulators. Gang leaders were threatening persons who opposed their program with violence. Many residents believed that if they opposed this resegregation group movement that they were in immediate danger of physical violence from the gang. In fact, the residents could not even speak against this resegregation program.

24. On September 27, 1944, the War Relocation Authority issued a statement that the petition was unauthorized. There was evidence, however, that the resegregationists continued their efforts to get signatures.

25. On October 15, 1944, several elderly Issei men were attacked by a group of assailants and severely beaten. The attack was instigated by one of the advisors of the Young Men's Fatherland Group. The attack was occasioned by these persons having publicly spoken against the activities of the resegregation group. [44]

26. On October 21, 1944, the gang leader of the Young Men's Fatherland Group addressed the members of the group and told them that he would incite the men to violence and promised to take care of them if they got into trouble.

27. On October 30, 1944, the right-hand man of the alleged gang leader knifed a young Nisei. The father of the victim had been a resegregationist, had "found out how rotten they were," and had publicly criticized the alleged gang leader. In addition to the known leaders of the disloyal organization, there was a group of unknowns, behind-the-scene advisors and strategists, who were much more powerful than the known leaders and members of the organization.

These unknown advisors and strategists employed force through the use of "goon" squads. These strong armed gangs of fanatic young men operated at night intimidating, threatening, attacking, beating, and even accomplished a murder. The local evacuee police force was afraid to interfere with the activities of these hoodlums.

28. On December 5, 1944, Mr. John L. Burling of the Alien Enemy Control Unit of the War Division of the Department of Justice arrived at the Tule Lake Center to initiate the hearings for renunciation of citizenship. Mr. Burling had been sent by Assistant Attorney General Wechsler.

29. On December 6, 1944, the renunciation hearings commenced and continued until December 14, 1944. During this period there was an intensification of tensions, fears, and extreme insecurity, brought about by misinterpretations of administrative policies on the part of the residents, which raised the residents to a state bordering on panic. The common witticism among officials of the center at the time of the renunciation hearing was that the population of the center was largely "mad" and that the center should be taken from the War Relocation Authority and transferred to the United States Public Health Service to be run as a specie of mental institution. A nucleus of genuinely pro-Japanese leaders whipped the people up [45] to hysterical frenzy of Japanese patriotism Also, at or near the renunciation hearing, the pro-Japanese organization established a "college of renunciation knowledge" and carefully coached those called for hearings on questions which would be asked and the correct answers to be given. Specific instructions were given on what to say and how to act at the hearings.

30. The following is a brief description of the physical facilities and operation of the renunciation hearing procedure. Mr. John L. Burling was assigned a hearing room for his exclusive use. He was assigned as a Caucasian interpreter and a Caucasian stenographer by the War Relocation Authority. Individuals who had applied for permission to renounce citizenship were called in separately and questioned by Mr. Burling. No other person of Japanese

964

ancestry was in the room. After the questioning was finished, the applicant was presented with a renunciation form which he was asked to sign. Stenographic transcripts were taken of each hearing.

31. On December 19, 1944, Major-General H. C. Pratt, Commanding General of the Western Defense Command, withdrew the public proclamations and orders of 1942 which had ordered the exclusion of all persons of Japanese ancestry from the West Coast area. This lifting of the exclusion order permitted all such persons to return to the West Coast with the exception of named individuals who were served with individual exclusion orders. The project newspaper, The Newell Star, published this proclamation on the same day.

32. Also on December 19, 1944, the War Relocation Authority, through Mr. Dillon Myer, issued a statement that all of the centers would be closed with a period of six months to one year after the revocation of the exclusion order. An Army team of some twenty officers further began to hold hearings on December 19 for the purpose of inducting loyal male residents of American citizenship [46] into the United States Army.

33. On December 23, 1944, Mr. John L. Burling returned to Washington, D. C. to report to Mr. Edward J. Ennis, head of the Enemy Alien Control Unit, Assistant Attorney General Wechsler, and Attorney General Francis Biddle. Mr. Burling had been at the Tule Lake Center a period of eighteen days.

34. On December 26, 1944, as a result of force, fears, coercions, and intimidations of pro-Japanese aliens upon American citizens, some two thousand (2,000) applications for renunciation poured into the Department of Justice in Washington, D. C. Such a great number of applications caused the Tule Lake Center Post Office system to break down under the pressure.

35. On December 27, 1944, seventy leaders and officers of the resegregation group were removed to the Alien Internment Camp in Santa Fe, New Mexico. These men were the most active leaders in the reign of terror which existed in the center during the renunciation hearings. The

removal of these seventy leaders gave the remaining terrorists and propagandists a stronger foothold over the pro-Japanese organizations.

36. In January 1945, Mr. John L. Burling again left Washington, D. C., for California with hearing officers, Charles M. Rothstein, Joseph J. Shevlin, Ollie Collins, and Lillian C. Scott.

37. Enroute to California, another avalanche of three thousand four hundred (3,400) additional applications for renunciation were received by the Department of Justice.

38. On January 11, 1945, the Department of Justice hearing officers arrived at the Tule Lake Center. By the time they arrived, of seven thousand (7,000) citizens over the age of eighteen (18) years, over five thousand (5,000) had applied for renunciation of their citizenship.

39. On January 18, 1945, Mr. Burling released a letter written on behalf of the Attorney General condemning the activities [47] of the resegregation group stating that they were "intolerable and they must cease." This letter was addressed to the Chairman of the Sokuji Kikoku Hoshidan and the Chairman of the Kokoku Seinen-dan as follows: "I am well aware that your two organizations have put pressure on residents of this center to assert loyalty to Japan and that in a number of cases physical violence was employed * * * It is as treasonable to coerce others into asserting loyalty to Japan here as it would be outside. All these activities will stop."

40. On January 26, 1945, the second group of pro-Japanese organization leaders and officers were removed to the Department of Justice Internment Camp at Santa Fe, New Mexico. About six hundred and fifty (650) members of the organization were removed on February 11, 1945, and one hundred and twenty-five (125) men were removed to the same camp on March 4, 1945.

41. On January 29, 1945, a statement by Mr. Dillon Myer was released in the project newspaper that "those who do not wish to leave the Tule Lake Center are not required to do so and may continue to live

here or at some similar center until January 1, 1946."

42. On February 11, 1945, after six hundred and fifty (650) members of the pro-Japanese organizations had been removed by the Department of Justice to the Santa Fe Alien Internment Camp, the anxiety and panic of the residents reached a new peak. Lawlessness, gangsterism, and hoodlumism prevailed at the center during this period. The residents of the Tule Lake Center had for almost four years been subject to the demoralizing effects of center life. They had suffered physical hardship and loss of property from the evacuation. They had been stigmatized by the press as rioters. Those who desired work were not given employment. They had been subject to misinterpretation of the renunciation procedure. They had been subject to rumors which had produced an irrational state of mind, which accompanied long detention, isolation, tension, and insecurity in the form of a mass hysteria. [48]

43. On March 16, 1945, the War Relocation Authority announced to the residents that the activities in which the pro-Japanese group had taken part, e. g., parades, drilling, and bugling, were unlawful and prohibited. This announcement came after the pressure by these disloyal elements had accomplished the purpose of having obtained a renunciation by a great majority of the residents of their citizenship.

44. Miye Mae Murakami lived during the entire renunciation procedure in Block 75 of Ward 8, admittedly the most rabid pro-Japanese section of the entire Tule Lake Center. She lived in an atmosphere of fears, threats, and scares stirred up by gangsters and hoodlums of the pro-Japanese organizations. She was threatened with her life unless she renounced, even in the supposed privacy of the women's washroom when rough-looking men invaded such room to put the women in fear of physical harm. She lived in an atmosphere of assaults, batteries, stabbings, and pressures from neighbors. She had heard of the mysterious murder of a leader of the Japanese community and that other residents would meet the same fate unless they renounced their citizenship. These threats and fears resulted in her losing completely any sense of perspective or balance in her thinking. She renounced her citizenship not of her own free will but by the pressure exerted upon her by the life in the community and by the fears that prevailed in the center.

45. Tsutako Sumi resided in Block 75, Ward 8. She lived in an atmosphere of threats, wild distorted reports and rumors. The pro-Japanese gangs attempted to force every one in the block to renounce their citizenship. The leaders applied pressure upon her husband to force him to coerce his wife to renounce her citizenship. She was cognizant of the beatings which had been imposed upon residents who had dared to oppose the pro-Japanese groups. She knew that the center police force, composed of Japanese evacuees, could never give her adequate protection in the case of an assault. She [49] was also caught in a whirlpool of mass anxiety, pressures, ridicules, and threats, which in the end resulted in her renouncing her citizenship against her will.

46. Mutsu Shimizu had heard of a murder committed upon a resident of the center which was followed by threats from pro-Japanese groups that other residents would meet the same end if they did not renounce. She was fearful of physical violence from Caucasians if she relocated. The pro-Japanese societies constantly stirred her emotions, fears, and anxieties. She lived in an atmosphere of pressures, compulsions, influences, and coercions which deprived her of any voluntary willingness to renounce her citizenship. Being subject to and living daily in such an atmosphere caused her to renounce her citizenship.

## Conclusions of Law.

1. This Court has jurisdiction under the provisions of 8 U.S.C.A. § 903, 54 Stat. 1171 and under the provisions of Judicial Code Section 274d, Amended, 28 U.S.C.A. § 400, now 28 U.S.C.A. §§ 2201, 2202.

2. The benefits of citizenship can be renounced or waived only as the result of free and intelligent choice. Since the purported renunciation of the plaintiffs Miye Mae Murakami, Tsutako Sumi, and Mutsu Shimizu was not as a result of their free and intelligent choice but rather because of

mental fear, intimidation, and coercions depriving them of the free exercise of their will, said purported renunciations are void and of no force or effect.

3. All of the plaintiffs are entitled to have their purported renunciations cancelled and they are further entitled to their full rights of citizenship; and all of the plaintiffs are further entitled to receive passports as citizens of the United States.

4. Judgment is hereby ordered to be entered cancelling the purported renunciations of all the plaintiffs and adjudging that [50] all the plaintiffs be restored to their full rights as citizens of the United States; and judgment is further ordered against the defendant to issue passports to the plaintiffs, as citizens of the United States, as prayed for in the Complaint.