McGRATH, Atty. Gen. et al. v.

TADAYASU ABO et al.

McGRATH, Atty. Gen. et al. v.

KANAME FURUYA et al.

Nos. 12251, 12252.

United States Court of Appeals
Ninth Circuit.

Jan. 17, 1951.

Rehearing Denied Feb. 27, 1951.

768

H. G. Morison, Asst. Atty. Gen., Frank J. Hennessy, U. S. Atty, Robert B. McMillan, Asst. U. S. Atty, San Francisco, Cal., Enoch E. Ellison, Sp. Asst. to Atty. Gen., Paul J. Grumbly, Atty., Dept. of Justice, Washington, D. C., for appellants.

Wayne M. Collins, San Francisco, Cal., for appellees.

A. L. Wirin, Fred Okrand, Los Angeles, Cal., for appellee Kawakami.

Before DENMAN, Chief Judge, and STEPHENS and ORR, Circuit Judges.

DENMAN, Chief Judge.

These are appeals[1] from two decrees based on findings that each of some 4315 plaintiffs below, Japanese descended native born United States citizens, was coerced by the conditions at the Tule Lake concentration camp in California, such conditions being caused by the United States officials having the plaintiffs in their charge, into a mental condition causing each against his or her free will to execute a document, procured in a proceeding before the Attorney General under § 401(i) of the Nation-

1. In the consideration of the appeals the appellees, plaintiffs below, are called plaintiffs; the appellants are called defendants.

It is stipulated that the records in the two cases are identical. Accordingly, both cases are disposed of in this opinion, although the plaintiffs in the two cases are different.

ality Act of 1940, as amended,[2] renouncing the plaintiff's American citizenship. It was found further that the Attorney General had determined that each plaintiff is a dangerous enemy alien, subject to deportation to Japan, and that at the time the complaints were filed each was held for deportation, purportedly pursuant to the Alien Enemy Act of 1798,[3] Presidential Proclamations 2525 [4] and 2655 [5] and the Regulations issued by the Attorney General thereunder.[6]

The decrees held each of the 4315 renunciation documents to be null and void ab initio, and order each cancelled and set aside and declared each appellee to be and to have been from birth a citizen of the United States and enjoined the defendants from restraining any plaintiff of his liberty or deporting any to Japan or otherwise interfering with his rights as a citizen.

The two complaints filed by some 975 named plaintiffs claim a several right to the rescission of his or her renunciation and a declaration that the enforced renunciation had not disturbed each plaintiff's continuous American citizenship and the several right of each not to be incarcerated and deported to Japan. Each plaintiff sought identical relief: the court's declaration that each have his renunciation set aside and be declared to be and to have been continuously a United States citizen, and an injunction restraining the defendants from their continued incarceration and any interference with their rights as citizens. The complaints further stated a case or controversy against defendants as required by Article III, section 2, clause 1, of the Constitution in the allegation that the defendants were restraining them for deportation to Japan. The answers to the amended complaints containing allegations of the same causes of action admitted the finding as to each that he is a dangerous alien enemy under the Presidential Proclamations and regulations supra and his restraint for deportation, and joined issue on the allegations that each had been coerced into his or her renunciation.

■ While the complaints did not expressly state that they sought relief for all other persons having the same rights and remedies, on motions for inclusion of additional named plaintiffs before the final decision on the merits the court treated them as if they had been so drawn, and we so regard them. Rule 15(b) Federal Rules of Civil Procedure, 28 U.S.C.A.

■ We think these are class suits within Rule 23(a) (3) of the Federal Rules of Civil Procedure providing:

"Rule 23. Class Actions

"(a) Representation. If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is

\* \* \* \* \* \*

"(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."

■ We interpret the phrase "common relief" as covering cases where all the plaintiffs seek the same type of relief, such as damages or an injunction, as distin-

---

2. "§ 401. A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by: * * *

"(i) making in the United States a formal written renunciation of nationality in such form as may be prescribed by, and before such officer as may be designated by, the Attorney General, whenever the United States shall be in a state of war and the Attorney General shall approve such renunciation as not contrary to the interests of national defense; * * *."
54 Stat. 1168, as amended by Act of July 1, 1944, 58 Stat. 677, 8 U.S.C.A. § 801 (i). The Act of July 1, 1944, added subsection (i).

The constitutionality of subsection (i) is upheld in Barber v. Tadayasu Abo, 9 Cir., 186 F.2d 775.

3. Act of July 6, 1798, 1 Stat. 577, R.S. § 4067, as amended, 40 Stat. 531, 50 U. S.C.A. § 21.

4. 55 Stat., Part 2, p. 1700.

5. 59 Stat., Part 2, p. 870.

6. 10 F.R. 12189.

guished from cases where some plaintiffs seek an injunction while others seek damages. In this we follow the ruling of the Second Circuit in which it is held that Rule 23(a) (3) covers cases where each plaintiff has a right to recover damages for a wrong done all, even though the amount of damages recoverable differs for the different plaintiffs. Oppenheimer v. F. J. Young & Co., 2 Cir., 144 F.2d 387, 390. The same principle was stated by the Seventh Circuit in Weeks v. Bareco Oil Co., 7 Cir., 125 F. 2d 84, 88. We agree with the Second Circuit that the relief attained in class suits under Rule 23(a) (3) extends only to the named plaintiffs actually becoming parties before judgment. York v. Guaranty Trust Co. of New York, 2 Cir., 143 F.2d 503, 529; cf. Schatte v. International Alliance, 9 Cir., 183 F.2d 685.

We thus have suits initiated by some 975 imprisoned plaintiffs, constituting members of a class, suits over which the district court clearly had jurisdiction because of such imprisonment for deportation by the Attorney General. Nationality Act of 1940, § 503, 8 U.S.C.A. § 903. Having such jurisdiction to establish the wrong done, equity may enjoin the threatened continuance of the wrong.

Some 3300 named plaintiffs were later added to the 975 of the original complaints before the cases were decided. It is not questioned that all these added plaintiffs fully met the necessary jurisdictional requirements at the time the complaints were filed. However, many of these several thousand were released from detainment for deportation by the Attorney General when added as plaintiffs and the question is whether in such a class suit they lost their right of intervention by such release. In this connection, this circuit has held that legislation for class suits should be liberally construed. Culver v. Bell & Loffland, 9 Cir., 146 F.2d 29, 31, so also the Eighth Circuit in Montgomery Ward Co. v. Langer, 168 F.2d 182, 187.

Applying this liberal rule of interpretation, we think the court had jurisdiction as to the later added plaintiffs who were confined for deportation when the complaint was filed. We also think the court properly retained its jurisdiction as to those plaintiffs who were under detention at the time they became parties but thereafter were released.

In this we need not go so far as does Professor Moore, who was chief research assistant to the reporter on the Supreme Court's Advisory Committee on the Federal Rules of Civil Procedure. He states that in suits under Rule 23(a) (3), where all the original plaintiffs meet the jurisdictional requirements, others may later intervene though they never have had such requirements.[7] The examples he gives are stated at page 3443 as follows: "Assume that a railroad negligently sets fire to property, and widespread damage to many property owners ensues. Here there is a question of law or fact common to many persons. A, B, and C bring an action on behalf of themselves, and all others similarly situated, against the railroad. If federal diversity jurisdiction is sought, A, B, and C, as original parties of record, must each have a claim in excess of $3,000 and there must be diversity between them as plaintiffs on the one hand and the railroad on the other. Other persons who had been injured could intervene regardless of the amount of their claim, or their citizenship. The judgment would bind A, B, C, and privies, the railroad, and all who had intervened, but would not bind others beyond the principle of *stare decisis,* which operates as to all judgments. While the spurious class suit is primarily used by plaintiffs, the converse situation is also possible. For example, A, who has been depositing foreign matter in a stream and has been sued or threatened with suit by a great many riparian owners, brings a bill of peace against X, Y, and Z individually and as representatives of other riparian owners. The latter owners could stay out of the action, but the utility of the class action is that they could intervene if they desired, regardless of the amount claimed by them or their citizenship. The

---

7. 3 Moore, Federal Practice 3443 (2d ed.).

judgment would bind all who were originally parties, who intervened, and who were in privity."

This extreme right of intervention was upheld in Shipley v. Pittsburg, & L. E. Ry. Co., D.C.W.D.Pa., 70 F.Supp. 870. There a class action was brought by 24 plaintiffs against a railway company claiming compensation for coupling air hose. In the original complaint each of the named plaintiffs possessed the requisite diversity of citizenship and a claim in the proper jurisdictional amount to give the federal court jurisdiction of the action. Thereafter, 58 additional plaintiffs, no one of whom had the jurisdictional requirement of both diversity of citizenship and a claim in excess of $3,000 exclusive of interest and costs, filed a motion to intervene. Still later, 29 additional trainmen moved to intervene, only four of whom had the requisite diversity and amount in controversy. The court allowed joinder of all the additional plaintiffs, even though most lacked the jurisdictional requirements of diversity of citizenship and a claim in excess of $3,000.

■ Since these class suits are on behalf of those detained by the Attorney General for deportation to Japan, and since there is no evidence showing that at the time of the filing of the complaint the Secretary of State, the Secretary of the Interior and the Secretary of the Treasury and those under the authority of each were participating in the internment for deportation, the court erred in awarding the plaintiffs judgment against any other than the Attorney General and those under his authority. It is ordered that the judgments be amended in this regard.

The cases were stipulated to be tried on the merits upon certain affidavits and documentary evidence. The stipulations further provided that if the court determined it desired further evidence on any factual or legal issue, it could order the production of the same, the stipulations in this regard reading that if the "Court deems it necessary for a proper decision of any factual or legal issue or issues involved in this case as to any particular plaintiff or plaintiffs the Court shall order the production of

further or additional evidence thereon and, in such an event, the parties hereto shall have the same rights in respect to the introduction of such further or additional evidence as to any such plaintiff or plaintiffs as they would have had if they had not entered into this stipulation." From this it is clear, if such an order were made, that upon introduction of such further evidence the burden of proof remained upon each plaintiff to establish his or her cause for relief.

The facts of the wrongful conditions prevailing at Tule Lake, common to each of the plaintiffs imprisoned there, are substantially the same as those in the findings in the case of Murakami v. Acheson, reported on appeal here in Acheson v. Murakami, 9 Cir., 176 F.2d 953, 960, where they are fully set forth. In that case, however, evidence was offered by each plaintiff showing that she individually was coerced into an involuntary renunciation of her citizenship.

*The double obligation of the government with reference to the 4315 plaintiffs.*

The Attorney General has indicated an appreciation of the wrongs done those whose renunciations were forced by the conditions at Tule Lake, described in the Murakami decision, supra, and has announced that that decision "would be accepted and applied by it [the Department of Justice] in all future cases of this kind brought within the jurisdiction of the courts."

The Attorney General also indicated his realization of his duty to the United States to prevent a restoration of citizenship to the disloyal renunciants who gave up their American citizenship voluntarily because of their sympathy with Japan and hoped for the latter's victory over the country of their birth, for there is added to the above statement the following: "This, of course, does not apply to any renunciant as to whom the Government files disclose evidence of disloyalty to the United States."

■ The record shows the certainty that many of the 4315 plaintiffs who voluntarily renounced were disloyal to the United States. It discloses that many of the plaintiffs did not show any interest in setting

aside their revocations until after the atomic bombing of Hiroshima and Nagasaki had made it clear that the Japanese cause was hopeless, and that the material conditions in the United States had become greatly preferable to those in Japan. Of such seekers for restoration of citizenship the Supreme Court, in Savorgnan v. United States, 338 U.S. 491, 502, 70 S.Ct. 292, quotes the language of Doreau v. Marshall, 3 Cir., 170 F.2d 721, 724, that "the forsaking of American citizenship, even in a difficult situation, as a matter of expediency, with attempted excuse of such conduct later when crass material considerations suggest that course, is not duress." Again, in Ludecke v. Watkins, 335 U.S. 160, 170, 68 S.Ct. 1429, 1434, 92 L.Ed. 881, it is stated: "It is not for us to question a belief by the President that enemy aliens who were justifiably deemed fit subjects for internment during active hostilities do not lose their potency for mischief during the period of confusion and conflict which is characteristic of a state of war even when the guns are silent but the peace of Peace has not come."

With respect to some of those freely desiring Japanese citizenship, the evidence also shows that over half the native born United States citizens at Tule Lake over fifteen years of age were Kibei, that is, persons sent by their parents to Japan for their education, of whom we found, on similar evidence in the Murakami case, 176 F.2d at page 958, that some were "permanently pro Japanese." In a cold war, already existing when the cases were tried and now with the hot war in Korea, the federal courts should be more vigilant than ever that the massing of 4315 plaintiffs in two suits does not conceal the facts as to such enemy minded renunciants.

*Minor and incompetent renunciants.*

The defendants admit that eight plaintiffs lacked sufficient mental capacity to accomplish legally binding acts and make no defense to their cases on the merits. Of the remaining plaintiffs many were under 21 years of age at the time they signed the renunciations. We think that they were incompetent to renounce.

In Perkins v. Elg, 307 U.S. 325, at page 334, 59 S.Ct. 884, at page 889, 83 L.Ed. 1320, the Supreme Court states that one "during minority is incapable of [making] a binding choice" as to his renunciation of a citizenship. At (sic) page 337, 59 S. Ct. at page 891, 83 L.Ed. 1320, it states, in construing a treaty dealing with the denaturalization of a citizen, that the "Rights of citizenship are not to be destroyed by an ambiguity."

Subsection (i) was added to eight other subsections, (a) to (h), of § 401 providing ways of losing United States nationality. Section 403(b) provided that "No national under eighteen years of age can expatriate himself under subsections *(b) to (g),* inclusive, of Section 401." 8 U.S.C.A. § 803(b). (Emphasis supplied).

The defendants claim that since Congress has made subsections (b) to (g), inclusive, applicable to persons over 18 years of age and that under subsection (a) a person has until 23 years of age to regain a citizenship lost by reason of the naturalization of a parent having legal custody of such person, we must construe subsection (i) as applying to persons of all ages. That is to say, a girl of 16 may disavow her citizenship in the proceeding established by subsection (i).

We do not agree. A preferable interpretation is that the 18 years under limit, being specifically prescribed for the methods of (b) to (g), leaves (i) as it would be if enacted alone, under the rule of *expressio unius.* In this we agree with the reasoning of the Board of Immigration Appeals in Exclusion Proceeding No. 56196/521, 2 Administrative Immigration & Nationality Decisions 390, 396, although there the Board was concerned with § 401 (j). The judgments below are affirmed as to each plaintiff who was incompetent and each who was under the age of 21 years at the time of his or her signing of the formal document of renunciation, the judgments to be amended to state the name of each such person.

*The adult renunciants who were competent to renounce their citizenship.*

■ As to the remaining adult plaintiffs, the burden of proof is on each to show that he was brought to a condition of mind by his treatment while interned which destroyed his free action in renouncing.

■ The evidence shows that all such plaintiffs, save 83 later considered, were imprisoned at Tule Lake when they renounced. It further shows the oppressive conditions prevailing there were in large part caused or made possible by the action and inaction of those government officials responsible for them during their internment. Because of the oppressiveness of this imprisonment by the government officials, a rebuttable presumption arises as to those confined at Tule Lake that their acts of renunciation were involuntary. Cf. Williston on Contracts, § 1625A (Rev.ed.).

■ This presumption requires the defendants to go forward with the evidence and produce evidence rebutting it. When such evidence is introduced, the presumption disappears, but the fact of the coercive conditions remains as a part of each plaintiff's showing to support his individual burden of proof. Del Vecchio v. Bowers, 296 U.S. 280, 286, 56 S.Ct. 190, 80 L.Ed. 229; Department of Water and Power v. Anderson, 9 Cir., 95 F.2d 577, 582.

The district court rendered an interlocutory decree on the stipulated submission of the causes on the merits. It found on substantial evidence the coercive conditions existing at Tule Lake but correctly recognized the likelihood that some of the plaintiffs were disloyal Americans who renounced voluntarily. Pursuant to the stipulations for submission on the merits it ordered that "defendants may have 90 days from date hereof within which to file a designation of any of the plaintiffs concerning whom they desire to present further evidence. As to any plaintiff, not so designated by the defendants within the time specified, a final decree may enter. *As to any plaintiff designated in the manner*

*and within the time specified, further hearings, after notice duly given, will be held."* (Emphasis supplied.) [Tadayasu Abo v. Clark, 77 F.Supp. 806, 812.]

The interlocutory decree ordered that a judgment be entered in favor of those plaintiffs not designated by the defendants "for special individual hearings."

■ Such an order is supported as to those at Tule Lake by the presumption arising from the conditions shown to exist there. The interlocutory decree recites the affidavits it considered in reaching its decision as those "based upon facts ascertained from personal observation by individuals who appear unbiased." From these is conspicuously excluded the affidavit of verification to the amended complaint in No. 12251 by one plaintiff, Masaru Yamaichi. He swore, in effect, that *each of the approximately 1400 plaintiffs* then in the case had renounced his or her citizenship because of his or her mental and physical fear induced by the conditions at the Tule Lake camp. This omnibus knowledge of the particular mental condition of each of scores, much less hundreds, of persons is a patent absurdity and such evidence properly was ignored by the court. *The burden of proof in the special individual hearings of the designated plaintiffs.*

■ Under the order permitting the designations, the burden of proof remained on each designated plaintiff for, as seen, the stipulation for submission provided that, as to evidence so ordered to be admitted, "the parties shall have the same rights * * * as they would have had if they had not entered into this stipulation."

The district court in a later order failed to recognize this stipulation as to the burden of proof or the fact that the burden remains on the plaintiff when substantial evidence is introduced rebutting the presumptions arising from the coercive conditions caused by officials holding the plain-

tiffs in custody at Tule Lake. Before any of the permitted designations and offers of proof regarding them had been made, the district court made a further order conditioning the designations and proof on the assumption *by the defendants* of the burden of proof. The language of the proviso is: "provided, however, that as to any such plaintiff or plaintiffs who so shall be designated by the defendants for special individual further hearing herein, the *burden of proof shall be and remain upon the defendants herein* to prove that the renunciation of each such plaintiff, so designated for such special further hearing herein, was wholly voluntary, uncoerced and uncompelled and was of the free will, choice, desire and agency of such plaintiff and was neither caused by nor affected by the duress, menace, coercion, intimidation, fraud or undue influence in which he or she was held and subjected to, as aforesaid." (Emphasis supplied.)

 Despite the erroneous proviso that the defendants must assume the burden of proof, they designated various groups of plaintiffs and the evidence they would offer showing the voluntary character of their renunciations. Among them are 448 of whom it is alleged that they were "Kibei who spent their formative years in Japan and had been active members of pro-Japanese groups at Tule Lake." Though using this language in its interlocutory decree as describing some of the plaintiffs who "individually acted freely and voluntarily despite the present record facts," the district court refused to receive such evidence as to these 448 plaintiffs.

Also, as to 83 plaintiffs the court refused to consider the defendants' offer to prove that their renunciations were made at detention camps other than Tule Lake. It is obvious such persons do not have the benefit of any presumption arising from the defendants' action at Tule Lake, and the defendants' contentions should have been considered.

 Though the order allowing the defendants to designate "any" plaintiff did not require them to state the character of the evidence to be offered concerning the designant, the defendants classified all the plaintiffs into different groups and stated what they would prove regarding each. Though the proposed evidence as to each group, save one group of 58 plaintiffs, would overcome the presumption of coercion, the district court refused to consider any offers of proof and entered the judgment in favor of each plaintiff. In this the court erred, quite likely because of its concept that the burden of proof had shifted to the defendants.

 Of 58 designants, the offer of proof is solely that they went to Tule Lake to be with family members. We think such proof would not overcome the presumption of coercion. The judgments in their favor are affirmed and are ordered amended to state their names.

Concerning the designants, the defendants have indicated their good faith in discharging their obligation to the individual loyal renunciants and their duty to prevent the restoration of citizenship to the disloyal. They offer to accept the several affidavits of many of the designants, each showing that his or her renunciation was, in fact, coerced, thus saving their appearances as witnesses or the taking of their depositions. That the massing in one suit of thousands of cases of individual several rights to renunciation in which each had his several burden of proof places a heavy burden on the court is obvious. However, the added plaintiffs were admitted through the exercise of the court's discretion and there is a large saving of filing and verification costs and the necessity of proof in each individual case of the conditions at Tule Lake.

The judgments are reversed as to all the designated adult and competent plaintiffs other than the 58 last discussed, and the cause is remanded for further proceedings in accord with this opinion.