291 F.2d 10
 NORIO KIYAMA, Appellant,
v.
Dean RUSK, as Secretary of State of the United States of
America, Appellee.
MIYOKO KIYAMA, Appellant,
v.
Dean RUSK, as Secretary of State of the United States of
America, Appellee.
 No. 16893.
 United States Court of Appeals Ninth Circuit.
 May 9, 1961.
 
 Wirin, Rissman, Okrand & Posner, A. L. Wirin and Fred Okrand, Los Angeles, Cal., for appellants.
 Laughlin E. Waters, U.S. Atty., Donald A. Fareed, Asst. U.S. Atty., Chief of Civil Division, James R. Dooley, Asst. U.S. Atty., Los Angeles, Cal., for appellee.
 Before CHAMBERS BARNES and MERRILL, Circuit Judges.
 BARNES, Circuit Judge.
 
 
 1
 There is combined on this appeal the separate appeals of Norio and Miyoko Kiyama. Each is one of the many appeals arising out of the mass evacuation at the start of World War II of Japanese from the West Coast, whether such Japanese were solely nationals of Japan, United States citizens of Japanese descent, or those with the dual nationality of both Japan and the United States.
 
 
 2
 The district court had jurisdiction of the action below under section 503 of the Nationality Act of 1940 (54 Stat. 1171, formerly 8 U.S.C.A. 903, now 8 U.S.C.A. 1503)[1]
 
 
 3
 Appellants had severally been denied the right or privilege as a national of the United States to return to the United States from Japan, upon the ground he or she was not an United States citizen. Each had renounced his or her United States citizenship at the Tule Lake Segregation Center during World War II.[2] This court has jurisdiction on appeal. 28 U.S.C. 1291.
 
 
 4
 This is not the first time these matters have been before this court after trial below. A consolidated trial was originally had in the district court between July 10th and 13th, 1956, and judgment entered on August 27, 1956, in favor of the government and against each appellant herein.
 
 
 5
 The judgment of the district court was affirmed by this court on August 11, 1958.[3] Thereafter a rehearing was denied.[4] Five months later, upon a petition for rehearing, this court, by a per curiam order[5] remanded the cause for further proceedings below, including 'a reappraisal in the light of the proper burden of proof,' but 'express(ing) no view upon the evidence or the weight thereof.'[6]
 
 
 6
 In accordance with the mandate of this court, further proceedings were had below. Thereafter the district court again entered judgment in favor of appellee and against each appellant, holding that each of the appellants had lost his or her United States nationality by voluntarily making in the United States a formal written renunciation of nationality, and as to each appellant found and concluded:
 
 
 7
 'The burden rested upon the defendant to prove by clear, convincing and unequivocal evidence that the act showing renunciation of United States citizenship was voluntarily performed. The evidence meets this test and clearly shows that the plaintiff voluntarily renounced his (her) citizenship.'[7]
 
 
 8
 Having satisfied ourselves that appellants have received the benefit of the teachings of our Supreme Court, particularly that enunciated in Nishikawa v. Dulles, supra, we have before us but one question: Was the court's conclusion that the evidence was clear, convincing and unequivocal to establish the voluntary nature of appellants' renunciation of United States nationality, proper in view of the drastic consequences of denationalization?
 
 
 9
 In considering this question, we are required to, and do, bring to it a sympathetic scrutiny of the entire record suggested as necessary by Mr. Justice Frank-furter in his opinion concurring in the result of Nishikawa, supra.
 
 
 10
 As counsel for appellants has suggested we should, we first consider true as a background for this case those facts found by Judge Mathes in the District Court in Acheson v. Murakami (unreported), which vividly portrayed the conditions prevailing at the Tule Lake Center after the mass evacuation. These findings were attached to and made a part of this court's opinion appearing in 9 Cir., 176 F.2d 953, at pages 960-966. In that opinion Judge Denman found that each of such findings made below was supported by the evidence. He characterized all the factors so found 'as leading to a condition of mind and spirit of the American citizens imprisoned at Tule Lake Center, which makes the renunciation of citizenship not the free and intelligent choice of the appellees.'
 
 
 11
 This was caused by the 'unnecessarily cruel and inhuman treatment of these citizens (a) in the manner of their deportation for imprisonment, and (b) in their incarceration for over two and (one-) half years under conditions in major respects as degrading as those of a penitentiary * * * and (c) in applying to them the Nazi-like doctrine of inherited racial enmity.'[8]
 
 
 12
 Our attention is likewise very properly recalled by appellants to the Abo case[9] wherein the court below[10] had held each of the 4,315 renunciation documents to be null and void ab initio, in a class suit filed by 975 named plaintiffs. This court, in reversing, commented on the wrongful conditions prevailing at Tule Lake, as described in Acheson v. Murakami, supra. This court also pointed out that:
 
 
 13
 'The Attorney General has indicated an appreciation of the wrongs done those whose renunciations were forced by the conditions at Tule Lake * * * and has announced that the decision 'would be accepted and applied by it (the Department of Justice) in all future cases of this kind brought within the jurisdiction of the courts."
 
 
 14
 This court then commented in Abo, supra, upon the reservation made by the Attorney General in his statement that: 'This, of course, does not apply to any renunciant as to whom the Government files disclose evidence of disloyalty to the United States.' This court in such comment stated:
 
 
 15
 'The Attorney General also indicated his realization of his duty to the United States to prevent a restoration of citizenship to the disloyal renunciants who gave up their American citizenship voluntarily because of their sympathy with Japan, and hoped for the latter's victory over the country of their birth * * *.'This court in Abo also made an important and pertinent statement upon the record then before it, which it is likewise our duty to have in mind:
 
 
 16
 'The record shows the certainty that many of the 4,315 plaintiffs who voluntarily renounced were disloyal to the United States. It discloses that many of the plaintiffs did not show any interest in setting aside their revocations until after the atomic bombing of Hiroshima and Nagasaki had made it clear that the Japanese cause was hopeless, and that the material conditions in the United States had become greatly preferable to those in Japan. Of such seekers for restoration of citizenship the Supreme Court in Savorgnan v. United States, 338 U.S. 491, 502, 70 S.Ct. 292, 94 L.Ed. 287, quotes the language of Doreau v. Marshall, 3 Cir., 170 F.2d 721, 724, that 'the forsaking of American citizenship, even in a difficult situation, as a matter of expediency, with attempted excuse of such conduct later when crass material considerations suggest that course, is not duress." 186 F.2d 771-772.[11]
 
 
 17
 This court then noted that a rebuttable presumption exists that those confined at Tule Lake made renunciations which were involuntary. Such presumption was held sufficient to support a judgment in favor of such renunciants, where the government had produced no other evidence against them, and desired to produce none. But, this court said:
 
 
 18
 'As to 83 plaintiffs the court refused to consider the defendants' offer to prove that their renunciations were made at detention camps other than Tule Lake. It is obvious such persons do not have the benefit of any presumption arising from the defendant's action at Tule Lake, and the defendant's contentions should have been considered.'[12]
 
 
 19
 With the holdings of these several cases in mind, we consider the contents of the various exhibits, particularly Exhibits 1, 2 and 3. The latter was a book entitled 'The Spoilage.'[13] Counsel for appellants rely largely on the content of these books to paint a picture of the effect on the individual Japanese on the evacuation, the subsequent registration, and the renunciations. Appellants' counsel state in oral argument that the contents of these exhibits alone is sufficient to require a holding that the act of renunciation was involuntary. With this we cannot agree. As was stated in McGrath v. Abo, supra, the record shows with certainty that many of the 4,315 Japanese who voluntarily renounced their citizenship were disloyal to the United States. The fact that many Japanese (if not most of them) were loyal does not alter nor disprove the disloyalty of the few. It but emphasizes it.
 
 
 20
 The facts of this case are undisputed. We note first that appellants when evacuated by the military first spent six months at Santa Anita Assembly Center, Arcadia, California (hereafter 'Anita') and then, after transfer, spent a year at the Gila River Relocation Center, Gila River, Arizona (hereafter 'Gila') before being transferred in October 1943 to the Tule Lake Segregation Center. On December 27, 1944, appellant Norio was transferred with sixty-nine others to the Santa Fe Internment Camp, Santa Fe, New Mexico (hereafter 'Santa Fe') as one of the '70 leaders and officers of the resegregation group' which constituted the first group of 'the most active leaders in the reign of terror which existed in the (Tule) Center during the renunciation hearings.' (Finding 35, p. 964, Appendix to Acheson v. Murakami, supra.) Later (February 11, 1945) there were transferred six hundred and fifty individuals in a second group to Santa Fe, and on March 4, 1945, one hundred and twenty-five more were transferred. (Finding 40, 176 F.2d at page 964, Acheson v. Murakami, supra.) In November 1945 appellant Norio returned to Japan. In 1950 he returned to the United States on a Certificate of Identity to prosecute this action, having been refused a passport in November of 1949 because of his previous renunciation while at Tule Lake.
 
 
 21
 We think we must divide our examination of appellant Norio's conduct during the time under scrutiny into three periods: (1) pre-evacuation; (2) evacuation to Tule Lake 'imprisonment'; (3) post-Tule Lake. The horrible conditions prevailing at Tule Lake could have had no bearing on pre-Tule Lake actions. They might well have had an effect on post-Tule Lake actions.
 
 
 22
 Norio Kiyama was born in Los Angeles, California, in 1915. He returned to Japan in 1922, remaining there in school until 1931. He married in 1938 and had two children, each registered by their parents at the Japanese Consulate in this country, in order that each might obtain Japanese citizenship. Norio had registered for the draft, but had never voted in this country. He has never renounced Japanese nationality. (Ex. F, p. 1, Item 2.)
 
 
 23
 Miyoko Kiyama was born at Manhattan Beach, California, in 1921. When seven years old, she went to Japan and remained ten years for her education. After marriage and the registration of her children with the Japanese Consulate to obtain citizenship, Miyoko never renounced her Japanese citizenship (Ext. W., p. 1, Item 2), nor ever registered to vote in an American election.
 
 
 24
 While no 'relocation center' can be desirable, nor anything less than a prison, 'Gila' at least was not in the same class as 'Tule Lake.' The record abundantly supports such a conclusion.[14] Perhaps the best proof is the evidence that many services on behalf of the United States war effort were performed by the occupants of 'Gila,' including an army language school, a camouflage net factory, and a model ship factory. Not the least was the number of volunteers for army service.
 
 
 25
 We quote from the Government Brief with respect to 'Gila River,' and appellants' conduct there, all occurring prior to 'Tule Lake':
 
 
 26
 'At Gila River, 9,746 persons registered for the Army Enlistment and WRA Leave-Clearance Registration Program in 1943. Of these registrants, 8,823, or more than ninety per cent, answered 'Yes' to Question 28, which asked whether the registrant was willing to swear unqualified allegiance to the United States and to faithfully defend it from attack by foreign forces.
 
 
 27
 'On February 12, 1943 appellant Norio Kiyama signed a form entitled 'Statement of United States Citizen of Japanese Ancestry'. In answering questions 27 and 28 of this form, appellant Norio stated that he was unwilling to serve in the Armed Forces of the United States, and that he was unwilling to swear unqualified allegiance to the United States and to faithfully defend it from attack by foreign forces. On the same date, appellant Norio also signed a form entitled 'Application for Leave Clearance,' on which he indicated that he did not desire employment in any part of the United States.
 
 
 28
 'On March 1, 1943 appellant Miyoko Kiyama signed a form entitled 'Application for Leave Clearance'. On this form appellant Miyoko indicated that she desired no employment and that she would not take employment in any part of the United States. She also stated in answering questions 27 and 28 that she would not be willing to volunteer for the Army Nurse Corps or the Woman's Army Auxiliary Corps and that she was not willing to swear unqualified allegiance to the United States of America and to forswear allegiance to the Japanese Emperor.
 
 
 29
 'On June 30, 1943, appellant Miyoko Kiyama signed a form entitled 'Individual Request for Repatriation'. In executing this form appellant Miyoko requested that she be repatriated to Japan. Also on June 30, 1943 appellant Norio Kiyama signed two forms entitled 'Individual Request for Repatriation' and 'Request for Repatriation-- Family Summary'. In executing these forms appellant Norio requested that he and his family be repatriated to Japan. On July 28, 1943, appellant Miyoko executed another 'Individual Request for Repatriation'.
 
 
 30
 'During October, 1943 the appellants were transferred to the Tule Lake Segregation Center. Before being transferred, the appellants were given an opportunity to change their 'no-no' answers to questions 27 and 28. The appellants failed to change their answers, knowing that if they did not do so they would be transferred to Tule Lake.' (Gov. Brief, pp. 7-8.)
 
 
 31
 After transfer to Tule Lake, Norio became a member of 'Hokoku-Seinen-dan',[15] a militant pro-Japanese organization. Miyoko became a member of 'Hokoku Joshi Seinen-dan', the women's militant pro-Japanese organization.
 
 
 32
 On December 12, 1944, Miyoko, and on December 13, 1944, Norio, signed their respective formal 'Renunciation of United States Nationality.' Earlier in that year Norio had signed a second request for repatriation, on behalf of his immediate family. Earlier that year, in October, both Norio and Miyoko had written letters to the Attorney General of the United States requesting advice as to what legal steps they could take to renounce their American citizenship, and the citizenship of their children. In November each appellant signed applications to so renounce their own citizenship, and Norio added a P.S.: 'I would also like to have my two daughters' American citizenship renounced also.' (Ex. H, p. 3.) Four days later Norio supplemented and strengthened his request by writing to the Attorney General that he had had military training in Japan for three years. Norio now claims this statement was a falsehood.
 
 
 33
 On December 7, 1944, a hearing on Norio Kiyama's renunciation of citizenship was held. At this hearing appellant Norio stated, among other things, that he desired to renounce his American citizenship; that he signed the application to renounce freely and voluntarily; that before Pearl Harbor his loyalty was to Japan, and that his layalty was still with Japan; that he hoped and believed that Japan would win the war; that 'The spirit of Japan is so strong it will be able to win'; and that 'I think the Emperor is the highest power and I worship him.'
 
 
 34
 Also on December 7, 1944, Miyoko Kiyama's renunciation of citizenship hearing was held. At this hearing she stated, among other things, that she signed the application to renounce citizenship freely and voluntarily; that when she returned to this country in 1938 her loyalty was to Japan rather than to the United States; that before December 7, 1941, her loyalty was with Japan; and that she would like to see Japan win the war.
 
 
 35
 After his removal to Sante Fe, Norio on three occasions asked to be repatriated, and on one (September 27, 1945) stated: 'I have been always loyal to Japan during the war and I have no intention to change my loyalty to any other country at this time.' This was after the actual hostilities between the United States and Japan were over.
 
 
 36
 The trial court found that the renunciations made by appellants were voluntarily made. It further recognized the substantial burden on the government (placed there by Nishikawa v. Dulles, supra, and other cases) and specifically found such burden to prove that the renunciations were voluntary had been met by clear, convincing and unequivocal evidence presented by the government.[16]
 
 
 37
 It is our duty to re-examine the facts to determine if the government has carried its burden.[17] We cannot accept the finding of the district court as conclusive, as we ordinarily might on a question of fact, and just as the Supreme Court will not accept the concurrent findings of two lower courts as conclusive in matters of this kind.[18]
 
 
 38
 An examination of the record before us does not leave 'the issue in doubt.' We have read the record. We have considered the evidence which antedates the renunciation, 'the evidence which clusters around that date,' (in the words of Mr. Justice Douglas) and that which follows it. We have considered the appraisal of the veracity of the witnesses by the judge who saw and heard them[19] and have given it that 'due regard' required by the Rules of Civil Procedure. Rule 52(a), 28 U.S.C.A. We conclude with the district court that there is solid, convincing evidence[20] that both appellants before the date of their renunciations, at that time, and subsequently, were loyal Japanese subjects and faithful and devoted followers of the Japanese cause and worshipers of the Japanese Emperor, and that with such feelings and beliefs knew and realized precisely what they were doing when they renounced their American citizenship.
 
 
 39
 We have carefully read the testimony in this case, and looked over the exhibits, reading much but not all of them. Norio would have the courts believe he was coerced by unknown and nameless[21] proJapanese sympathizers when he signed the various papers-- when he differed with ninety per cent of the Japanese at Gila; when he twice indicated his lack of loyalty to the United States before Tule Lake; when he declined to change his answers to the two 'No' questions; when he six times at Tule Lake requested repatriation or renunciation, or both; when he three times thereafter sought similar treatment; when he voluntarily left the United States for Japan. But his present explanation seems to this court, as it did to the trial court, an unconvincing protestation, when compared to the written record.[22] Norio admitted he was not told by any group what to say-- just that he 'wrote everything which he didn't really mean[23] . . . so it would look bad.'[24]
 
 
 40
 Norio would not admit he had applied for membership in Hokoku Seinen-dan-- but asserted that 'someone put my name in the organization'[25] -- one Ino Hashi.[26] Submission of his name to the Hokoku Seinen-dan by Ino Hashi was the only 'force' used on Norio,[27] although 'certain groups there threatened us to bodily harm,'[28] and he was 'forced to march' with the Hokoku Seinen-dan. Norio's father, his mother, his wife's mother and his wife's father, his own brother, and at least one of his wife's brothers, were able more successfully than these appellants to resist the alleged 'pressure,' 'force' and 'fear.' These relatives did not go to Tule Lake,[29] and they did not answer 'No-No' (as appellants did) to the two important questions as to loyalty asked of all prior to Tule Lake.[30] In fact neither of the appellants admitted they had ever discussed with their respective parents, their brothers, or other relatives, these questions when all were at Gila and living close to each other, if not together.
 
 
 41
 The evidence as to the wife is admittedly not as strong as that against the husband. Miyoko Kiyama testified she signed what her husband had already signed because she did not want to be separated from him. In this testimony, she corroborated her husband.[31] When faced with the problem of possibly leaving her husband or renouncing the country of her birth, Miyoko chose the latter, following the Biblical injunction whether she knew of it or not. For so doing, we do not criticize her. We note, however, that by the records in evidence, her action indicating loyalty to Japan, on at least one occasion preceded that of her husband.[32]
 
 
 42
 But counsel for appellant Miyoko insists that because she wanted to be with her husband, the 'duress of devotion' or the marital compulsion, as a matter of law, prevents a loss of citizenship. Cited to support this position is the one case of Mendelsohn v. Dulles, D.C.Cir.1953, 207 F.2d 37. What the court holds therein is that the marital compulsion of devotion to a sick wife entitles a person losing his citizenship to his day in court to attempt to prove his loyalty, so that it may be determined whether there was or was not duress sufficient to make his act an involuntary one. To hold such 'marital compulsion' as a matter of law entitles any wife to a finding that her acts were involuntary on her part would render the congressional enactment operative as to one spouse-- the husband-- but not as to both. We cannot believe this to be the law.
 
 
 43
 If we are to believe from the evidence that Miyoko Kiyama had no mind of her own; no loyalties to either Japan or the United States, but only a 'loyalty' to her husband's loyalties-- whatever they might at the moment be-- then she has proved but one fact-- her lack of loyalty to any country. This negative lack cannot aid her in proving as a positive matter that any renunciation she made over her signature was involuntary. It proves only a lack of will in any direction. It proves nothing that will aid her here. It establishes only that she would, in the future, as she says she has in the past, blindly follow her husband's wishes and his loyalties to a foreign power, even though that power be hostile to the country whose citizenship she now seeks. While she had no duty to go forward with any positive proof, her lack of proof cannot aid her to overcome the positive proof produced by the government.
 
 
 44
 We conclude that were we triers of the fact, we would have concluded as did the learned judge below that the several renunciations of citizenship were the voluntary acts of each appellant repeatedly performed. We agree with the court below that the government has accepted and sustained its heavy burden of proof in cases such as these. No other error having been charged or found by us, we severally affirm the judgments of the district court below.
 
 
 
 [1]
 This section reads, in part:
 '1503. Denial of rights and privileges as national-- Proceedings for declaration of United States nationality.
 '(a) If any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person may institute an action under the provisions of section 2201 of Title 28, against the head of such department or independent agency for a judgment declaring him to be a national of the United States, except that no such action may be instituted in any case if the issue of such person's status as a national of the United States (1) arose by reason of, or in connection with any exclusion proceeding under the provisions of this chapter or any other act, or (2) is in issue in any such exclusion proceeding. An action under this subsection may be instituted only within five years after the final administrative denial of such right or privilege and shall be filed in the district court of the United States for the district in which such person resides or claims a residence, and jurisdiction over such officials in such cases is conferred upon those courts.
 Application for certificate of identity; appeal
 '(b) If any person who is not within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person may make application to a diplomatic or consular officer of the United States in the foreign country in which he is residing for a certificate of identity for the purpose of traveling to a port of entry in the United States and applying for admission. * * *'
 
 
 [2]
 Such renunciation was made possible by the provisions of 8 U.S.C.A. 801(i), now repealed, but now covered by 8 U.S.C.A. 1481(a)(7), which provides in material part, using precisely the same language as 8 U.S.C.A. 801(i):
 '1481(a) * * * a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by--
 '(7) making in the United States a formal written renunciation of nationality in such form as may be prescribed by, and before such officer as may be designated by, the Attorney General, whenever the United States shall be in a state of war and the Attorney General shall approve such renunciation as not contrary to the interests of national defense; * * *'
 
 
 [3]
 Norio Kiyama v. Dulles, 9 Cir., 1958, 258 F.2d 109, 111
 After a recital of the facts appearing in the record, this court listed the four assignments of error charged, found 'no merit' in any of them (relying on Tsuyoshi Iwamoto v. Dulles, 9 Cir., 1957, 256 F.2d 100), and added:
 'The acts and utterances of the appellants throughout the entire time mentioned in this proceeding leave no doubt as to where their loyalty was and would be again if tested.'
 The judgment denying citizenship was affirmed.
 
 
 [4]
 Rehearing was denied November 4, 1958. In the per curiam of denial, this court called attention to the case of Nishikawa v. Dulles, 356 U.S. 129, 78 S.Ct. 612, 617, 2 L.Ed.2d 659, decided March 31, 1958, which held:
 'Whenever the issue of voluntariness (of any conduct which results in expatriation) is put in issue, the Government must in each case prove voluntary conduct by clear, convincing and unequivocal evidence.'
 This placed the burden of proving voluntariness of the renunciation on the government. The trial court, in Kiyama, supra, had, according to assignment of error two, held that the burden rested upon appellants (there and here). However, (this court said in denying the petition for a rehearing) 'on the facts, the Government has met this requirement by proving voluntary conduct by clear, convincing and unequivocal evidence.' This court admitted 'the use of the words 'there is not merit in any of the assignments of errors' may have been unfortunate in view of the ruling of the Supreme Court in the Nishikawa case * * *.'
 
 
 [5]
 268 F.2d 110
 
 
 [6]
 We interpret the language used in the second sentence of the second full paragraph of the second page of the slipsheet opinion (268 F.2d 110 at page 111, 2nd sentence, second full P, 1st col.) to mean:
 'We are constrained thereby to hold the affirmative burden of establishing 'the voluntary conduct that is the essential ingredient of expatriation' by clear, convincing and unequivocal evidence (is on the Secretary of State).'
 The court noted the procedural rule set up to protect American citizens by birth is sui generis, and contrary to the general rule. See note 1, order of April 27, 1959, Kiyama v. Dulles, 268 F.2d 110 at page 111.
 
 
 [7]
 Norio-- Finding of Fact XXIX, and Conclusion of Law II, 2 C.T. 12; Miyoko-- Finding of Fact XXIII, and Conclusion of Law II, 2 C.T. 20-21
 
 
 [8]
 Acheson v. Murakami, 9 Cir., 1949, 176 F.2d 953, 954
 
 
 [9]
 McGrath v. Tadayasu Abo, 9 Cir. 1951, 186 F.2d 766, 771
 
 
 [10]
 Tadayasu Abo v. Clark, D.C., 77 F.Supp. 806
 
 
 [11]
 The court in Abo continues:
 'Again, in Ludecke v. Watkins, 335 U.S. 160, 170, 68 S.Ct. 1429, 1434, 92 L.Ed. 881, it is stated: 'It is not for us to question a belief by the President that enemy aliens who were justifiably deemed fit subjects for internment during active hostilities do not lose their potency for mischief during the period of confusion and conflict which is characteristic of a state of war even when the guns are silent but the peace of Peace has not come.'
 'With respect to some of those freely desiring Japanese citizenship, the evidence also shows that over half the native born United States citizens at Tule Lake over fifteen years of age were Kibei, that is, persons sent by their parents to Japan for their education, of whom we found, on similar evidence in the Murakami case, 176 F.2d at page 958, that some were 'permanently pro Japanese.' In a cold war, already existing when the cases were tried and now with the hot war in Korea, the federal courts should be more vigilant than ever that the massing of 4315 plaintiffs in two suits does not conceal the facts as to such enemy minded renunciants.' Id., 186 F.2d at page 772.
 
 
 [12]
 McGrath v. Tadayasu Abo, supra, 186 F.2d at page 774. The court then affirmed the judgments in favor of fifty-eight renunciants who had merely gone to Tule Lake to be with their family members, and reversed as to all others
 
 
 [13]
 The Spoilage, by Thomas and Nishimoto, University of California Press, 1946. Ex. 1 was WRA, A Story of Human Conservation, published by the War Relocation Authority of the United States Department of Interior; Ex. 2 was Impounded People-- Japanese Americans in the Relocation Centers, likewise published by the War Relocation Authority of the United States Department of Interior (1946)
 
 
 [14]
 The 'loyalty' pattern, as determined by registration results, for the ten relocation projects strikingly indicates the contrast between Rule Lake and all other projects. (Chart II, p. 62, The Spoilage.) And see, tr. p. 307
 
 
 [15]
 Translated as 'Young Men's Organization to Serve Our Mother Country.'
 
 
 [16]
 Finding XXIX, Tr. p. 12, and Finding XXIII, Tr. pp. 20, 21
 
 
 [17]
 Knauer v. United States, 1946, 328 U.S. 654, 657, 66 S.Ct. 1304, 90 L.Ed. 1500
 
 
 [18]
 Knauer v. United States, supra; Baumgartner v. United States, 1944, 322 U.S. 665, 670-671, 64 S.Ct. 1240, 88 L.Ed. 1525
 
 
 [19]
 Finding XXVI, Tr. 11, and Finding XX, Tr. 20
 
 
 [20]
 Paraphrasing Knauer v. United States, supra, 328 U.S. at page l61, 66 S.Ct. at page 1308
 
 
 [21]
 Direct Examination of Norio Kiyama, Tr. pp. 175, 187, 197, 199; Cross Examination of Norio Kiyama, Tr. p. 267:
 'Q. Now, you said certain groups made you sign this form. What groups were those? A. I mean the reactionary group in the camp and the people that had been living near my home that was supposed to be the members.
 'Q. And do you know the name of this group? A. I do not.
 'Q. Do you know the names of any members of this group? A. I cannot recall.
 'Q. Did you tell this group you had already applied for repatriation? A. No, I did not tell them, but before I did apply, I had met those men that told me to do so.'
 See also Tr. pp. 285, 299. But see, Tr. p. 313, under examination by his own counsel.
 
 
 [22]
 It is unnecessary here to refer to every document signed by Norio or Miyoko Kiyama. Norio's attitude is best portrayed by: (a) his letter to the Attorney General of the United States written of his own volition, dated October 15, 1944, just before the renunciation of December 13, 1944 (Def's Ex. G); (b) the postscript added to his 'Application for Permission to Renounce United States Nationality,' dated November 10, 1944 (Def's Ex. H), reading: 'P.S. I would also like to have my two daughters' American Citizenship renounced also.'; (c) his voluntary addition of certain information by letter to the Attorney General, dated November 14, 1944, to the November 10, 1944 application (Def's Ex. I); (d) the transcription of the hearing of December 7, 1944 (Def's Ex. J); and (e) his renunciation of December 13, 1944 (Def's Ex. K). These documents, other than the renunciation itself, read as follows:
 Exhibit G:
 'Tule Lake Center 'Newell, California 'October 15, 1944
 'Honorable Francis Biddle
 'Attorney General
 'State Department of Justice
 'Washington, D.C.
 'Honorable Francis Biddle:
 'Please permit me to inquire upon the problem I am confronted with concerning renounciation of American citizenship.
 'A year ago my wife and I arrived at this Tule Lake Segregation Center as the result of our loyalty to Japan and wishing expatriation at the first opportunity offered. Our daughters, Akemi and Masumi Kiyama, were born to us in United States of America and we wish to take them with us to Japan upon our going.
 'I have read in the newspaper in the early part of July of the Denaturalization Bill when it was passed by the United States Congress and signed by the United States President. My family and I, too, are immensely interested in this matter of relinquishing our American citizenship as we are determined on our returning to Japan. I am a bearer of dual citizenship, and my desire to return to Japan is great. As my family and I have no further need of our American citizenship, I would very much appreciate to have our American citizenship renounced and regard the members of my family as Japanese nationals.
 'After reading the denationalization article in the papers, I was anxiously waiting for the day that this Bill would go into effect. As the Bill has already passed the Congress and signed by the President, I expected the application for denationalization to take place within sixty days. To date, this has not materialized. As I am very anxious to make my application, I appealed to you for some information which you may have concerning renounciation of citizenship. I sincerely would appreciate your kindness if you could advise me as to what legal steps I should take.
 'Thanking you in advance, I remain
 'Respectfully yours, '(s) (Mr.) Norio Kiyama (29) Years
 'P.S. My daughters' ages are:
 'M Akemi Kiyama-- 4 years 11 month. 'Masumi Kiyama-- 3 years 2 month.'
 Exhibit I:
 'Tule Lake Center 'Newell, California 'November 14, 1944
 'Honorable Francis Biddle
 'Attorney General
 'Department of Justice
 'Washington 25, D.C.
 'Honorable Francis Biddle:
 'On the Question No. 8 of the 'Application for Permission to Renounce United States Nationality' pertaining to military service or training, I forgot to mention that I had a temporary exemption from the Japanese military service before and up until December 7, 1941 and also I have had military training while attending Yasugi Nogakko in Shimane-ken, Japan for 3 years under the Japanese Army but had no rank.
 'Will you please add this to my application. Thanking you in advance, I remain
 'Sincerely yours, '(s) Norio Kiyama
 'P.S. I was training for 3 years from 1928 to 1931.'
 Exhibit J:
 'Kiyama, Norio-- Calendar #9 #9250
 December 7, 1944
 'Hearing of Renunciation of Nationality. Hearing conducted by: Hearing Officer,
 John L. Burling, Dept. of Justice
 Interpreter: Miss Georgia Newbury 'Stenographer: Henrietta Thomas (Note: Subject does not speak good English-- hearing conducted through interpreter).
 'Q. I have been designated by the Attorney General as a Hearing Officer to hear cases of persons who wish to renounce their nationality and I have also been designated as an officer before whom persons may make a written renunciation of their nationality. Do you understand? A. Yes, I have no further need for my citizenship and do not want it.
 'Q. I will show you an application for permission to renounce United States citizenship and ask you if that is your signature? A. Yes, that is my signature.
 'Q. Did you sign this paper freely and voluntarily? A. Yes, it was my own wish.
 'Q. Did any organization, group or individual urge you to renounce your citizenship? A. No.
 'Q. Do you understand that if you renounce your citizenship you will abandon forever any legal rights that you may have as a citizen of the United States? A. Yes, I understand.
 'Q. I will show you a letter addressed to the Attorney General, dated October 13, 1944, and ask you if that is your signature? A. Yes, that is my signature.
 'Q. Who wrote that letter? A. I wrote it.
 'Q. How could you? You can't speak English. A. I wrote it with the aid of the dictionary.
 'Q. It is impossible to write a letter with those grammatical expressions if you don't speak English even though you do have a dictionary. A. Someone helped me.
 'Q. Who helped you? A. I do not know his name.
 'Q. Where does he live? A. I don't want to tell his name.
 'Q. You do know his name but you won't tell us. Is that it? A. I know his name but I am not saying it. He is a well known person.
 'Q. How old were you when you left the United States? A. Seven years old.
 'Q. You were sixteen when you returned? A. Yes.
 'Q. Why did you return to this country? A. Just to travel. I came just for a trip.
 'Q. Did you intend to return to Japan? A. Yes.
 'Q. When you returned to this country was your loyalty to Japan or the United States? A. Because I am a Japanese, I think it is clear what I will answer to that question. I am a Japanese.
 'Q. Before Pearl Harbor was your loyalty to Japan or the U.S.? A. Japan.
 'Q. Is that true today? A. Yes. I have never changed my mind.
 'Q. Do you hope that Japan will win the war? A. Yes.
 'Q. Do you think Japan will win the war? A. Yes.
 'Q. How? A. The spirit of Japan is so strong it will be able to win.
 'Q. How do you regard the Emperor? A. I think the Emperor is the highest power and I worship him.
 'Kiyama: I am concerned about the letter form that you asked me about. If I say anything about it, will I be checked upon or will anything be done about getting the other person in trouble?
 'Burling: No.'
 
 
 [23]
 Tr. p. 301
 
 
 [24]
 Tr. pp. 175, 184, 185, 302; Tr. pp. 285-6
 
 
 [25]
 Tr. p. 273
 
 
 [26]
 Tr. p. 273; Tr. p. 175
 
 
 [27]
 Tr. p. 278
 
 
 [28]
 Tr. p. 175
 
 
 [29]
 Tr. p. 266
 
 
 [30]
 In answering Questions 27 and 28 on February 12, 1943, Norio stated he was unwilling to serve in the Armed Forces of the United States, that he was unwilling to swear unqualified allegiance to the United States, and to faithfully defend it from attack by foreign forces. (Ex. A, Items 27 and 28.)
 In answering similar questions on March 1, 1943, Miyoko Kiyama stated she would not be willing to volunteer for the Army Nurse Corps or the Women's Army Auxiliary Corps and that she was not willing to swear unqualified allegiance to the United States of America, and to forswear allegiance to the Japanese Emperior. (Ex. T, Items 27, 28 and 33.)
 
 
 [31]
 Tr. pp. 177-179
 
 
 [32]
 Miyoko requested repatriation on June 3, 1943; Norio on June 30, 1943