# Voluntariness of Renunciations of Citizenship Under 8 U.S.C. § 1481(a)(6)

A renunciation of citizenship would likely not be held involuntary by a court solely because it was undertaken as part of an agreement whereby federal prosecutors agreed not to proceed with denaturalization and deportation proceedings if the subjects of the investigation agreed to renounce their U.S. citizenship. In the analogous context of plea bargaining in criminal cases, courts have consistently held that the threat of greater punishment by prosecutors does not by itself deprive the defendant of the ability to voluntarily choose to plea bargain, absent other indicia of improper coercion. In the absence of facts indicating further government coercion, a court would likely look to principles applicable to the determination of voluntariness in criminal plea bargains and conclude that renunciation of citizenship pursuant to the agreements at issue did not violate the constitutional requirement of voluntariness *per se.*

September 27, 1984

MEMORANDUM OPINION FOR THE ACTING LEGAL ADVISOR
DEPARTMENT OF STATE

This responds to your request for our opinion whether renunciations of United States citizenship under 8 U.S.C. § 1481(a)(6)[1] by two naturalized United States citizens who are alleged to have been involved in Nazi persecution are voluntary. These individuals, Mr. A and Mr. B, have formally renounced their United States citizenship pursuant to agreements negotiated with the Office of Special Investigations of the Department of Justice (OSI), whose mission is to identify, denaturalize, and deport persons who entered the United States subsequent to World War II and who obtained United States citizenship by concealing their involvement in Nazi persecution. Under those agreements, OSI agreed not to institute denaturalization and deportation proceedings if those individuals left the United States and formally renounced their citizenship.[2]

---

[1] Section 1481(a)(6) provides in part that a national of the United States may file a "formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state, in such form as may be prescribed by the Secretary of State."

[2] Your memorandum also mentioned a third individual, Mr. C, who formally renounced his United States citizenship after OSI instituted denaturalization proceedings. His renunciation does not present the same underlying issue that is common to the renunciations by Mr. A and Mr. B, because OSI did not negotiate or enter into any agreement in connection Mr. C's departure from the United States and his subsequent renunciation of citizenship. You have since informed us that the denaturalization proceedings against Mr C have been dismissed, and that OSI made representations to the court in connection with that dismissal, with your agreement, that Mr. C's renunciation was considered to be voluntary. We therefore do not address Mr. C's case here.

You are concerned that the formal renunciations of citizenship made by Mr. A and Mr. B may not meet the constitutional requirement that expatriation be a voluntary act,[3] because of the direct and substantial involvement of the United States Government in encouraging and facilitating the renunciations. Accordingly, you have asked this Office to review the background of these cases and to advise you whether the renunciations would be considered voluntary under applicable law. We understand that OSI and the Criminal Division of this Department have agreed to our consideration of these cases.

We believe it would be inappropriate, and indeed impossible, for this Office to provide you with a definitive answer as to whether these particular renunciations were *in fact* voluntary. We obviously cannot undertake any independent investigation of the underlying facts, and are not competent to resolve any factual disputes or contradictions that could conceivably arise in the course of such an investigation. Accordingly, our advice here focuses on the underlying legal standards and precedents that we believe should be applied to determine whether these renunciations were voluntary, and how we believe a court would apply those standards, based on the facts presented to us.

The question we address is whether, under applicable precedent, a court would find that the renunciations of citizenship pursuant to agreements with United States prosecutors are voluntary, in light of the influence brought to bear upon those individuals by the United States Government and the arguably coercive effect of the threatened denaturalization and deportation proceedings. For the reasons set forth below, we believe that a court would not conclude that a formal renunciation of citizenship is involuntary solely because it was undertaken pursuant to such an agreement. We do not believe that the involvement of United States prosecutors in influencing and facilitating such decisions necessarily amounts to duress or coercion that would vitiate the voluntariness of the choice faced by those individuals, *i.e.*, whether to renounce citizenship or to face the denaturalization and deportation proceedings. In reaching this conclusion, we find highly relevant judicial consideration in the criminal context of similar voluntariness questions raised by plea bargaining. The analogy is not exact, but we believe it is apt, and the reasoning used by the courts in evaluating the voluntariness of plea bargains is quite similar to that used in determining the voluntariness of expatriating acts under 8 U.S.C. § 1481.

We believe that circumstances could arise in which a renunciation of citizenship pursuant to an agreement by the United States Government not to institute denaturalization and deportation proceedings could be considered involuntary by the courts. If, for example, the prosecutors used threats of physical or mental intimidation, materially misrepresented the basis for and consequences of the agreement, withheld material evidence, or refused to allow the individual the assistance of counsel in meetings with prosecutors, the resulting renunciation of citizenship might well be considered by the courts to be involuntary. Similarly, if the individual was not competent to understand the terms of the

---

[3] *See Afroyim* v. *Rusk,* 387 U.S. 253 (1967); *Perkins* v. *Elg,* 307 U S. 325 (1939).

agreement and the consequences of his actions, or was not informed of the nature of the charges against him and of the consequences of his actions, his renunciation could well be considered to be involuntary. As far as we are aware, the Mr. A and Mr. B cases present none of these particular circumstances, and therefore we believe a court would find the renunciations to be voluntary.

I.

OSI was created by Attorney General Civiletti in 1979 to consolidate enforcement of immigration statutes and policy against suspected Nazi persecutors.[4] The usual practice of OSI has been to institute denaturalization proceedings under 8 U.S.C. § 1451(a)[5] if an investigation reveals that a Nazi persecutor obtained United States citizenship fraudulently or illegally, and then to institute deportation proceedings under 8 U.S.C. § 1251(a)(19) upon successful completion of denaturalization proceedings.[6] This process inevitably takes substantial time, effort, and resources, and its success depends in general on finding another country that is willing to accept the deported individual.[7]

---

[4] The Attorney General assigned to OSI "the primary responsibility for detecting, investigating, and, where appropriate, taking legal action to deport, denaturalize, or prosecute any individual who was admitted as an alien into or became a naturalized citizen of the United States and who had assisted the Nazis by persecuting any person because of race, religion, national origin, or political opinion." *See* Order of the Attorney General, Transfer of Functions of the Special Litigation Unit Within the Immigration and Naturalization Service of the Department of Justice to the Criminal Division of the Department of Justice, No. 851–79 (Sept. 4, 1979).

[5] Under 8 U.S.C. § 1451(a), a certificate of naturalization may be cancelled if it was "illegally procured or . . . procured by concealment of a material fact or by willful misrepresentation." Cases against alleged Nazi persecutors have been brought both on the basis that citizenship was procured "illegally," *see Fedorenko* v. *United States*, 449 U.S. 490 (1981), and on the basis that the individual made material misrepresentations or concealed facts about his association and involvement with Nazi activities, *see, e.g., Artukovic* v. *INS*, 693 F.2d 894 (9th Cir. 1982); *United States* v. *Ryan*, 360 F. Supp. 265 (E.D.N.Y. 1973). In denaturalization cases the government bears the burden of proof to establish by "clear and convincing" evidence that "citizenship was not conferred in accordance with strict legal requirements." *Schneiderman* v. *United States*, 320 U.S. 118, 123 (1943).

[6] That section, added by Pub. L. No. 95–549, § 103, 92 Stat. 2065, 2065–66 (1978), authorizes the deportation of any alien who,

> during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with —
>> (A) the Nazi government in Germany,
>> (B) any government in any area occupied by the military forces of the Nazi government of Germany,
>> (C) any government established with the assistance or cooperation of the Nazi government of Germany, or
>> (D) any government which was an ally of the Nazi government of Germany,
> ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion.

8 U.S.C. § 1251(a)(19).

[7] Under 8 U.S.C. § 1253, "[t]he deportation of an alien in the United States . . . shall be directed by the Attorney General to a country promptly designated by the alien if that country is willing to accept him into its territory." If the designated country does not agree to accept the individual into its territory, deportation of the alien "shall be directed to any country of which such alien is a subject, national, or citizen if such country is willing to accept him into its territory." Only if that government also fails to advise the Attorney General or the alien whether it will accept the alien (or advises that it will not), may the Attorney General exercise discretion to deport the alien elsewhere, in accordance with a specified list of countries (country from which alien entered the United States, country in which he was born, any country in which he resided prior to entering the country from which he entered the United States, etc.). *Id.* § 1253(a).

OSI has informed us that, in accordance with its standard practice, it conducted investigations of Mr. A and Mr. B that included questioning of those individuals under oath by OSI attorneys. After OSI completed its investigations, it contacted lawyers for Mr. A and Mr. B and advised them that their respective clients were serious targets for denaturalization and deportation because of their wartime activities on behalf of the Nazi regime. According to OSI, after reviewing the evidence against their clients the lawyers for those individuals asked OSI how potential litigation could be avoided. They were advised that OSI would refrain from litigating only if it could secure all the relief to which it would be entitled through denaturalization and deportation proceedings.

After further discussions between OSI and counsel for Mr. A and Mr. B, separate agreements were reached and executed by Mr. A and by Mr. B. Each agreement was also executed by their respective counsel, and by representatives of OSI and the Criminal Division.

The two agreements differ slightly in their terms, but their essential elements are the same. In the agreements, Mr. A and Mr. B recited that they are familiar with the allegations made against them by OSI, that they are subject to denaturalization and deportation, and that they were involved in Nazi activities. Both agreed permanently to depart the United States, and to renounce formally their United States citizenship before an appropriate United States official abroad. They further consented to the entry of orders of denaturalization and deportation if they failed to comply with the terms of the agreement, and waived any right to apply for discretionary relief, appeal, or any other procedure that would have the effect of reviewing or contesting either the agreement itself or any order of denaturalization or deportation entered pursuant to the agreement. Each agreement recites expressly that it is entered into "freely and voluntarily upon consultation with counsel," that the agreement had been personally reviewed and discussed with counsel, and that the signatory is not, and has not been, "under duress or compulsion of any kind." OSI has informed us that both Mr. A and Mr. B acknowledged in the presence of OSI representatives that they understood the terms of the agreements and the consequences of their actions.

For its part, OSI agreed not to commence any litigation seeking denaturalization or deportation against Mr. A and Mr. B and, in accordance with its existing policy, not to commence litigation seeking the revocation of United States citizenship of any family member whose citizenship was derived from the subject. The agreements further recite that "[t]he United States recognizes that" if the subject complies fully with the terms of the agreement, "there is no basis under U.S. law for limiting in any way [the] receipt of Social Security benefits."[8]

[8] The agreement reached with Mr. A recites only that there would be "no basis" for limiting receipt of Social Security benefits; the agreement reached with Mr. B recites that there would be no basis for limiting the receipt of "federal retirement, health care, and/or Social Security benefits." We do not read these provisions of the agreements to constitute a representation by OSI, on behalf of the United States Government, that no proceedings would be instituted against Mr. A and Mr. B to limit the receipt of such benefits. In fact, we would have some question about OSI's authority to make such promises. We interpret the provision

Continued

223

In accordance with these agreements, Mr. A and Mr. B have executed formal oaths of renunciation, coincidentally both before United States consular officers in the Federal Republic of Germany. In both cases, they were counseled by those officers as to the seriousness and significance of a renunciation of citizenship, and were given the opportunity to reconsider their decisions, as required by applicable State Department procedures.[9] Each also executed a "Statement of Understanding," reciting that he was exercising his rights of renunciation voluntarily.[10] In addition, Mr. B submitted a separate written "Declaration" stating that he was renouncing pursuant to an agreement with OSI.

In each case, the responsible consular officer raised questions with the State Department as to whether the renunciations may be considered voluntary, although they understood that under State Department regulations they were required to allow Mr. A and Mr. B to execute the oaths of renunciation. *See supra* note 9. The consular officer who accepted Mr. A's renunciation reported that Mr. A informed him he was renouncing his citizenship because of the agreement with OSI, and that Mr. A offered a statement that "[b]ecause I did not fully disclose the circumstances of my previous activities that would have affected my naturalization, I signed an agreement to avoid a hearing and

---

[8] (. . . continued)
rather to reflect OSI's understanding that under applicable federal laws and regulations a renunciation of citizenship would not affect entitlement to receipt of federal benefits accrued prior to that renunciation. We express no view as to the correctness of that legal conclusion.

[9] The State Department's Foreign Affairs Manual (FAM) sets forth the following procedure for acceptance of formal oaths of renunciation:

> After the officer has verified that a would-be renunciant does possess the United States nationality which he seeks to surrender, he shall have the would-be renunciant read or have read to him, in the language he understands best and in the presence of the consular officer and two witnesses thoroughly conversant in that language, the Statement of Understanding set forth [elsewhere in the FAM]. The consular officer, in the presence of the witnesses, should explain in detail all of the consequences flowing from the intended renunciation. This must be done in every case.
>
> The would-be renunciant should execute and sign the Statement in duplicate, under oath, in the language he understands best in the presence of the consular officer and two witnesses.
>
>                *       *       *
>
> In every case, the officer should suggest to the person that he defer the act of renunciation for a period to permit further reflection on the gravity and consequence of his contemplated act . . . . In no case, however, shall a United States citizen be denied the right to take the oath of renunciation.

8 FAM 225.6(g) & (h).

[10] For reasons that are not explained in the material we have been provided, the form of the statement of understanding and the oath of renunciation executed by Mr. A differs somewhat from the forms executed by Mr. B. The oath of renunciation executed by Mr. A recites that "I hereby absolutely and entirely renounce my United States nationality together with all rights and privileges and all duties of allegiance and fidelity therefore pertaining," and the statement of understanding recites his understanding that "I have a right to renounce my United States citizenship and I have decided voluntarily to exercise that right . . . The extremely serious nature of my contemplated act of renunciation has been fully explained to me . . and I fully understand the consequences of my intended action." The oath executed by Mr. B states that "I hereby absolutely and entirely, without mental reservation, coercion or duress renounce my United States nationality together with all rights and privileges and all duties of allegiance and fidelity thereunto pertaining." His statement of understanding recites that "I am exercising my right of renunciation freely and voluntarily without any force, compulsion, or under influence placed upon me by any person . . . The extremely serious and irrevocable nature of the act of renunciation has been explained to me . . . and I fully understand its consequences."

224

possible deportation, and I voluntarily renounced U.S. citizenship." Because of these statements, the consular officer declined to make a specific recommendation to the State Department concerning voluntariness, and left for "Departmental determination whether in view of this agreement Mr. A's renunciation should be considered voluntary." The consular officer who accepted Mr. B's renunciation was also unwilling to attest to its voluntariness, in light of a written statement filed by Mr. B stating that he was renouncing pursuant to an agreement with OSI, and oral statements made by Mr. B that he had "no choice" but to renounce in the face of threatened legal proceedings.

The execution of the oath of renunciation does not end the State Department's administrative role in renunciations of citizenship. Under current regulations, the consular officer must prepare a certificate of loss of nationality and submit it to the State Department for review and approval. 22 C.F.R. § 50.50, 8 FAM 224.1. That certificate must be approved and returned to the consular official for submission to the individual. 8 FAM 224.9. We understand that in most cases involving formal renunciations of citizenship the State Department routinely approves the certificate of loss of nationality. The State Department has informed us orally, however, that it interprets its responsibility under 8 U.S.C. § 1481 to encompass discretion to determine whether a particular renunciation meets the requirements of the statute and of the Constitution when information available to the Department suggests that the renunciation may be defective.[11]

Neither Mr. A nor Mr. B has indicated to the State Department that he will challenge the loss of his citizenship, although such a challenge would generally not be raised until the certificate of loss of nationality has been issued.[12] Under current State Department practice, individuals may challenge any holding by the State Department of loss of United States nationality by an appeal to a Board of Appellate Review established in the State Department. *See* 22 C.F.R. §§ 7.3, 50.52. If the Board of Appellate Review upholds the loss of nationality, the individual may institute an action in federal district court for a judgment declaring him to be a national of the United States. 8 U.S.C. § 1503; 28 U.S.C. § 2201.

## II.

### A. Constitutional and Statutory Framework

The Fourteenth Amendment guarantees that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States." The Supreme Court has interpreted this guarantee to preclude Congress from stripping a citizen of citizenship without his assent. *Afroyim* v. *Rusk*, 387 U.S. 253, 268 (1967); *see also Perkins* v. *Elg*, 307 U.S.

---

[11] This administrative construction appears consistent with the role given the State Department under § 1481 We do not, however, find it necessary to address the validity or weight of that interpretation here.

[12] State Department regulations provide that the time for filing an appeal to the Board of Appellate Review runs from the time of approval by the Department of the certificate of loss of nationality. 22 C.F.R. § 7.5.

325, 334 (1939); *Nishikawa* v. *Dulles*, 356 U.S. 129, 133 (1958). The importance of citizenship and the severe consequences of a loss of that citizenship have heavily influenced the Court's reading of the language of the Fourteenth Amendment:

> Citizenship is no light trifle to be jeopardized any moment Congress decides to do so under the name of one of its general or implied grants of power. In some instances, loss of citizenship can mean that a man is left without the protection of citizenship in any country in the world — as a man without a country. Citizenship in this Nation is a part of a cooperative affair. Its citizenry is the country and the country is its citizenry. The very nature of our free government makes it completely incongruous to have a rule of law under which a group of citizens temporarily in office can deprive another group of citizens of their citizenship. We hold that the Fourteenth Amendment was designed to, and does, protect every citizen of this Nation against a congressional forcible destruction of his citizenship, whatever his creed, color or race. Our holding does no more than to give to this citizen that which is his own, a constitutional right to remain a citizen in a free country unless he voluntarily relinquishes that citizenship.

*Afroyim* v. *Rusk*, 387 U.S. at 267–68.[13] *See also Trop* v. *Dulles*, 356 U.S. 86, 92 (1958); *Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144, 160–61 (1963).

Thus, with the exception of formal denaturalization,[14] a United States citizen can lose his citizenship only if he voluntarily performs an act that is "in derogation of allegiance to the United States," 42 Op. Att'y Gen. 397, 400 (1969), and that was committed with the intent to relinquish United States citizenship. *See Vance* v. *Terrazas*, 444 U.S. 252, 261 (1980). "[A]n act which

---

[13] In *Afroyim* v. *Rusk*, the Court expressly rejected the argument it had previously upheld in *Perez* v. *Brownell*, 356 U.S. 44 (1958), that Congress' implied power to deal with foreign affairs as an indispensable attribute of sovereignty, plus the Necessary and Proper Clause, empower Congress to withdraw citizenship without the assent of the citizen. Relying substantially on consideration by various Congresses of bills that would have provided for some form of expatriation, the Court concluded in *Afroyim* that the framers of the Fourteenth Amendment intended clearly "to put citizenship beyond the power of any governmental unit to destroy," 387 U.S. at 263, and that Congress therefore lacks the constitutional authority to strip a citizen of citizenship without his consent.

[14] Denaturalization can apply only to citizens who acquired their citizenship by naturalization, because it is premised on impropriety in the naturalization proceedings. *See* 3 Gordon & Rosenfield, *Immigration Law & Procedure*, § 20.1 (1983) (Gordon & Rosenfield) Expatriation, on the other hand, applies to any citizen, whether he acquired his citizenship through birth or through naturalization, and does not involve any challenge to the lawfulness of the individual's acquisition of citizenship. *Id.* The power of Congress to provide for denaturalization of naturalized citizens has long been viewed as an incident of its authority "[t]o establish a uniform Rule of Naturalization," U.S. Const art. I, § 8, cl. 4, and necessary to protect the integrity of the naturalization process. *See Johannessen* v. *United States*, 225 U.S. 227 (1912), *Luria* v. *United States*, 231 U.S. 9 (1913); *Knauer* v. *United States*, 328 U.S. 654, 673 (1946) Conceptually, denaturalization does not fall within the general rule that citizenship can only be lost by voluntary action, because denaturalization is intended to redress errors in the naturalization process that would disentitle the individual to United States citizenship *ab initio. See* 3 Gordon & Rosenfield § 20.2C.

does not reasonably manifest an individual's transfer or abandonment of allegiance to the United States cannot be made a basis for expatriation." 42 Op. Att'y. Gen. at 400.

Although the Supreme Court has definitively held that Congress cannot provide by statute for involuntary expatriations, it has upheld Congress' authority to prescribe by statute the types of acts that Congress considers to be generally "highly persuasive evidence . . . of a purpose to abandon citizenship." *See Nishikawa* v. *Dulles*, 356 U.S. at 139; *Vance* v. *Terrazas*, 444 U.S. at 261, 265. These acts are set forth in § 349 of the Immigration and Nationality Act, 8 U.S.C. § 1481. One of these specified acts is a "formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state." 8 U.S.C. § 1481(a)(6). Other specified acts include: obtaining naturalization in a foreign state; taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state; serving in the armed forces of a foreign state; serving in an office or employment under the government of a foreign state that requires assumption of the nationality of that state or a declaration of allegiance to that state; or committing an act of treason against the United States. *Id.* § 1481(a)(1)-(4), (7). The statute places the burden of proof on the party asserting that nationality has been lost, but establishes a rebuttable presumption that the act was committed voluntarily:

> Whenever the loss of United States nationality is put in issue in any action or proceeding . . . the burden shall be upon the person or party claiming that such loss occurred, to establish such claims by a preponderance of evidence. Except as otherwise provided . . . any person who commits or performs, or who has committed or performed, any act of expatriation under the provisions of this chapter or any other Act shall be presumed to have done so voluntarily, but such presumption may be rebutted upon a showing, by a preponderance of the evidence, that the act or acts committed or performed were not done voluntarily.

*Id.* § 1481(c). This presumption and the "preponderance of the evidence" standard have been upheld by the Supreme Court as within the constitutional authority of Congress. *Vance* v. *Terrazas*, 444 U.S. at 264–67. The statutory presumption does not apply, however, to intent; the party asserting the loss of nationality bears the burden of proof, by a preponderance of the evidence, that the act was committed with the intent to relinquish United States citizenship. *See id.* at 268.

Thus, the analysis the courts have determined is required by the Constitution and by statute in any case in which a loss of nationality is alleged is three-fold:

> (1) Has the individual committed one of the acts set out in § 1481?

> (2) If so, can the individual overcome the statutory presumption that the expatriating act was performed voluntarily?

227

(3) Can the party claiming that citizenship was lost establish by a preponderance of the evidence that the act was committed with the intent to relinquish citizenship?

Here, our analysis focuses on the second question — that of the voluntariness of the renunciations in light of the threat that OSI would institute denaturalization and deportation proceedings.[15] Obviously, judicial decisions construing the voluntariness requirement of § 1481 are relevant precedent, and provide the basic framework for that analysis. In addition, we believe that decisions involving the voluntariness of guilty pleas entered pursuant to criminal plea bargains are highly relevant. The agreements negotiated between OSI and Mr. A and Mr. B are analogous in many respects to plea bargains, albeit in a civil, rather than a criminal, context. As in criminal plea bargains, Mr. A and Mr. B have agreed to waive or relinquish important constitutional rights in exchange for an agreement by United States prosecutors not to press forward with judicial proceedings that they otherwise could properly institute. As we discuss further below, the plea bargain analogy must be applied with care, because plea bargains, unlike the agreements negotiated with OSI at issue here, are subject to scrutiny by the courts before they become final. Nonetheless, we believe the analysis of the voluntariness issue by the courts in plea bargain cases is instructive, particularly because we have found no cases under § 1481 that raise precisely the factual situation raised by your request.

We will outline first the relevant precedents under § 1481, and then discuss the relevant cases involving the voluntariness of plea bargains. Finally, we will apply those precedents to the cases of Mr. A and Mr. B.

### B. Judicial Decisions Construing "Voluntariness" Requirement of 8 U.S.C. § 1481

The courts have consistently recognized that an expatriating act cannot be considered to be voluntary if the circumstances demonstrate that the individual was coerced or compelled to commit the expatriating act:

There is no dispute that citizenship will not be relinquished when the citizen performs an act of expatriation with a gun at his head, or under threat of jail, or under other circumstances involving duress, mistake, or incapacity negating a free choice.

3 Gordon & Rosenfield § 20.9b. If a citizen is forced into an expatriating act by circumstances essentially beyond his control, the *sine qua non* of expatriation

---

[15] There is no question that Mr A and Mr. B executed formal oaths of renunciation in accordance with the forms and procedures established by the Secretary of State under § 1481(a)(6). With respect to the question of intent, it seems unlikely that any successful challenge could be raised by either of those individuals on the ground that he did not intend, by execution of that oath, to relinquish United States citizenship. *See, e.g., Davis* v. *District Director, INS,* 481 F. Supp 1178, 1181 (D.D.C. 1979) (in formal renunciation cases, question of intent would normally not arise). The State Department Board of Appellate Review has taken the position that a formal renunciation of United States citizenship in the manner prescribed by law *ipso facto* demonstrates an intent on the part of renunciant to relinquish citizenship. *See, e.g., Case of V W v d H* (Aug. 25, 1982). In any event, we do not understand that the question raised by your request concerns the intent of Mr. A and Mr. B to relinquish United States citizenship, but rather concerns the voluntariness of their renunciations.

228

is lacking, and therefore no effect should be given to the expatriating act. *See Doreau* v. *Marshall*, 170 F.2d 721, 724 (3d Cir. 1948); *Stipa* v. *Dulles*, 233 F.2d 551, 555 (3d Cir. 1956).

The difficulty lies in determining what circumstances amount to duress or compulsion that would negate the voluntariness of the expatriating act. The courts have held that conscription into military service, particularly in a totalitarian country, may make such service and any attendant oath of allegiance involuntary, if the individual would otherwise face physical punishment, imprisonment, or economic deprivation.[16] Under some circumstances, the courts have concluded that familial obligations, or the need to satisfy basic subsistence needs, may rebut the presumption of voluntariness for actions such as extended residence abroad[17] or acceptance of employment by a state agency of a foreign government.[18] Evidence that the individual relied on material misrepresentations or erroneous advice by government officials has been held to satisfy the burden of rebutting the presumption of voluntariness.[19]

Although the courts have been receptive to claims of duress because of the importance of citizenship and the severe consequences of expatriation, they have also recognized that the difficulty of making a choice between alternatives and the motivation for that choice does not necessarily make the expatriating act involuntary:

> If by reason of extraordinary circumstances amounting to true duress, an American national is forced into the formalities of citizenship of another country, the *sine qua non* of expatriation is lacking .... On the other hand, it is just as certain that the forsaking of American citizenship, even in a difficult situation, as a matter of expediency, with attempted excuse of such conduct later when crass material considerations suggest that course, is not duress.

*Doreau* v. *Marshall*, 170 F.2d at 724. Particularly in cases involving formal renunciations of citizenship or other written disclaimers of citizenship,[20] the

[16] *See, e.g., Nishikawa v. Dulles*, 356 U.S. at 139 (compulsory military service in Japanese army); *Kamada v. Dulles*, 145 F. Supp. 457 (N.D. Cal. 1956) (same); *see also Fukumoto v Dulles*, 216 F.2d 553 (9th Cir. 1954) (application for Japanese citizenship); *Kuwahara v. Acheson*, 96 F. Supp. 38 (S.D. Cal. 1951) (voting in post-war Japan compelled by fear of retaliation, loss of ration card, tradition of obedience to authority); *Takehara v. Dulles*, 205 F.2d 560 (9th Cir. 1953) (same), *Kamada v. Dulles*, 145 F. Supp. at 460–61 (same).

[17] *See, e.g., Mendelsohn v Dulles*, 207 F.2d 37 (D.C. Cir. 1953) (need to care for gravely ill wife); *Ryckman v. Acheson*, 106 F. Supp. 739 (S.D. Tex. 1952) (need to care for ill mother).

[18] *See, e.g., Insogna v Dulles*, 116 F. Supp. 473 (D.D.C. 1953) (acceptance of employment in bureau of Italian Government); *Kamada v. Dulles*, 145 F. Supp. at 459 (acceptance of employment as teacher in Japan).

[19] *See, e.g., Moser v. United States*, 341 U.S. 41 (1951) (alien not disbarred from application for citizenship because he signed waiver of eligibility for military service, where government representatives had informed him that he would not be precluded from citizenship); *Podea v. Acheson*, 179 F.2d 306 (2d Cir. 1950) (steps leading to conscription in Rumanian Army caused by erroneous advice of State Department); *Hong v. Dulles*, 214 F.2d 753 (7th Cir. 1954) (improper refusal of U.S passport).

[20] The only judicial decision we are aware of in which a court concluded that a formal renunciation of citizenship was involuntary is *Acheson v. Murakami*, 176 F.2d 953 (9th Cir. 1949). In that case, the court concluded that renunciations by United States citizens of Japanese descent, while they were interned during

Continued

courts have drawn a distinction between duress and motivation, and have emphasized that the critical question is whether the individual was free to choose between alternatives available to him, even if the choices might be difficult and the individual might be motivated by economic, emotional, or moral concerns. In *Jolley* v. *INS*, 441 F.2d 1245 (5th Cir.), *cert. denied*, 404 U.S. 946 (1971), the court considered whether a formal renunciation of citizenship by a United States citizen was voluntary, in light of the petitioner's contention that he was compelled to renounce citizenship in order to avoid violation of the United States selective service laws. The petitioner relied primarily on cases such as *Nishikawa* v. *Dulles, supra,* in which the courts had been receptive to arguments that service in the Japanese armed forces was involuntary and therefore not expatriating. In *Jolley*, the court drew what we believe is a valid distinction between petitioner's claim and the claims upheld in *Nishikawa* and other similar cases:

> Nishikawa was faced with the choice of either subjecting himself to Japanese penal sanctions or relinquishing his United States citizenship. The conflicting laws of the United States and Japan created a Hobson's choice which rendered either alternative involuntary. The same dilemma did not confront Jolley. While we accept the assertion that Jolley's abhorrence of the Selective Service laws caused him to apostatize himself, he cannot equate that abhorrence with coercion sufficient to render his renunciation involuntary as a matter of law . . . . The compulsion he felt to renounce his citizenship was of his own design. But opportunity to make a decision based upon personal choice is the essence of voluntariness. Such a choice was unavailable to Nishikawa, for he was forced by Japanese penal law to engage in what was then termed an expatriating act. The duress he felt was not of his own making. Jolley's expatriating act, on the other hand, was not compelled by law. He had the alternative to obey the dictates of the Selective Service System, an alternative he found impossible solely because of his own moral code. His renunciation was therefore the product of personal choice and consequently voluntary.

441 F.2d at 1250 (footnote omitted).[21] In cases involving the execution by

---

[20] (. . . continued)

World War II in the Tule Lake Relocation Center, were not a result of intelligent choice, but rather of "mental fear, intimidation, and coercion" that deprived them of the free exercise of their will. 176 F 2d at 959, 960–61. The court based its decision on evidence of the coercive effect of the cruel and inhuman treatment of those citizens during their imprisonment, the shock and resentment caused by the racist attitude of the commanding general of the camp, and fear of reprisal from militant pro-Japanese groups within the camp. The extraordinary circumstances found by the court to override the free will of those renunciants bears little factual resemblance to the circumstances surrounding Mr. A's and Mr. B's renunciations, and therefore we believe the *Acheson* holding is of limited precedential value here.

[21] *Nishikawa* and most of the other cases cited above were decided prior to 1961, when Congress amended

Continued

neutral aliens of waivers of eligibility for military service, which require the alien to waive future eligibility for United States citizenship, the courts have similarly rejected claims that pressures such as fear of retaliation or financial burden were sufficient grounds to constitute duress.[22] Recent relevant decisions by the State Department Board of Appellate Review provided to OSI have applied the *Jolley* rationale to reject claims of duress and compulsion, particularly when the expatriating act was a formal renunciation of citizenship or a formal rejection of allegiance to the United States.[23]

## C. *Voluntariness of Guilty Pleas Accepted Pursuant to Plea Bargains*

Although the reasoning of the decisions under § 1481 is instructive, none of those decisions presents a factual situation directly analogous to the renunciations by Mr. A and Mr. B. However, as we noted above, the agreements between OSI and Mr. A and Mr. B are analogous to plea bargains negotiated in the criminal context. In both, the individual gives up valuable constitutional rights — the right of citizenship, in the case of Mr. A and Mr. B, and the rights to trial by jury and to confront witnesses and the protection against compelled self-incrimination in the case of criminal defendants — in exchange for less severe treatment by government prosecutors, such as dismissal of other charges, reduction in charges, or a recommendation for a reduced sentence. The critical question is whether the individual gave up those constitutional rights voluntarily, or whether he was coerced into the waiver by the influence of the government prosecutors or by other factors. As in voluntariness cases arising under § 1481, the courts have held that the voluntariness of a guilty plea entered pursuant to a plea bargain can only be determined based on all of the relevant circumstances surrounding the waiver. *See Brady* v. *United States*, 397 U.S. 742, 749 (1970). Thus, although we recognize that there are procedural differences between the plea bargain cases and the Mr. A and Mr. B cases, we believe the analysis by the courts of the substantive issues involved — *i.e.*, whether a waiver of constitutional rights as part of a bargain with government prosecutors can be considered voluntary — is highly relevant to our analysis here.

---

[21] (. . continued)

§ 1481 to include the current presumption of voluntariness and the preponderance of evidence standard  Prior to that amendment, the burden was on the party claiming loss of citizenship to establish by "clear and convincing" evidence that the allegedly expatriating act was committed voluntarily. *See Nishikawa* v. *Dulles*, 356 U.S. at 135; *Vance* v. *Terrazas*, 444 U.S. at 264–65. Thus, although the reasoning of the courts in those pre-1961 cases remains instructive, it is impossible to determine whether the results would have been the same under the current evidentiary standards.

[22] *See, e.g., Ceballos* v *Shaughnessy*, 352 U.S. 599 (1957); *Prieto* v. *United States*, 289 F.2d 12 (5th Cir. 1961); *Jubran* v. *United States*, 255 F 2d 81 (5th Cir. 1958); *see generally* 1 Gordon & Rosenfield § 2.49d (collecting cases) ("[I]t was concluded that the alien had a free choice, that he chose to forego military service and must endure the consequences, and that there was no coercion in contemplation of law. The mere difficulty of this choice is not deemed to constitute duress. If the alien made a free and deliberate choice to accept benefits, he will be bound by his election.").

[23] *See, e.g., Case of D R L* (July 6, 1984) (naturalization in Canada); *Case of N A McG* (Sept. 2, 1982) (formal renunciation); *Case of E M v d H* (Aug. 25, 1982) (same); *Case of V W v d H* (Aug. 25, 1982) (same).

231

The practice of criminal plea bargaining has been recognized by the Supreme Court as constitutional, and indeed as an important part of the criminal justice system. *See Brady* v. *United States*, 397 U.S. at 750; *Mabry* v. *Johnson* 467 U.S. 504 (1984). The Court has specifically rejected the argument that guilty pleas entered pursuant to such bargains must be considered involuntary because of the government's involvement in and responsibility for some of the circumstances motivating the plea:

> The State to some degree encourages pleas of guilty at every important step in the criminal process . . . . All these pleas of guilty are valid in spite of the State's responsibility for some of the factors motivating the pleas; the pleas are no more improperly compelled than is the decision by a defendant at the close of the State's evidence at trial that he must take the stand or face certain conviction.

*Brady* v. *United States*, 397 U.S. at 750. The involvement of government prosecutors and the overhanging threat of greater punishment does not necessarily deprive the defendant of free choice:

> The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant. That he would not have pleaded except for the opportunity to limit the possible penalty does not necessarily demonstrate that the plea of guilty was not the product of a free and rational choice . . . .

*North Carolina* v. *Alford*, 400 U.S. 25, 31 (1970) (citations omitted). The courts have emphasized that plea bargaining rests on a mutuality of advantage; the government perceives an advantage in avoiding a trial that would consume scarce resources and in which it might not prevail, while the defendant avoids the burdens of trial and limits his exposure to penalties. *See Brady* v. *United States*, 397 U.S. at 752.

Because of the importance of the constitutional rights at stake and the risk of abuse by government prosecutors, courts have been extraordinarily careful in reviewing plea bargains, and have required that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady* v. *United States*, 397 U.S. at 742; *see also North Carolina* v. *Alford*, 400 U.S. at 31; *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938). In reviewing the constitutional sufficiency of plea bargains, the courts have generally required proof of a number of factors, including: (1) that the defendant has real notice of the charges against him;[24] (2) that he is aware of the evidence, both inculpatory and exculpatory, available to the prosecutors;[25] (3)

---

[24] *See Marshall* v. *Lonberger*, 459 U.S. 422, 436 (1983); *Henderson* v. *Morgan*, 426 U.S. 637, 638 (1976).

[25] *See Fambo* v. *Smith*, 433 F. Supp. 590, 598–99 (W.D.N.Y.), *aff'd*, 565 F.2d 233 (1977).

that he has been fully informed of the consequences of the plea;[26] (4) that he is competent to understand the plea and its consequences;[27] and (5) that he has had the effective assistance of counsel.[28] In addition, the courts have recognized that government misconduct or overreaching such as physical abuse or threats, extensive interrogation of the defendant without assistance of counsel, or material misrepresentation by prosecutors can amount to duress that undercuts the voluntariness of a plea.[29]

However, a threat to prosecute where the facts warrant prosecution is generally not considered to be coercion or intimidation. "To establish fear and coercion on a plea an individual must show he was subjected to threats or promises of illegitimate action." *O'Neill* v. *United States*, 315 F. Supp. 1352, 1354 (D. Minn. 1970), *aff'd*, 438 F.2d 1236 (1971); *see also Ford* v. *United States*, 418 F.2d 855, 858 (8th Cir. 1969). Moreover, while the defendant's admission that he committed the acts charged in the indictment may be highly significant evidence of the voluntariness of his act and an important protection against abuse, such an admission is not a constitutional prerequisite to acceptance of the plea, provided the defendant "intelligently concludes that his interests required entry of a guilty plea and the record before the judge contains strong evidence of actual guilt." *North Carolina* v. *Alford*, 400 U.S. at 37.

Of course, the process of plea bargaining and the entering of guilty pleas is subject to stringent procedural requirements that provide the court with an opportunity to assess the circumstances of the bargain and the defendant's understanding and acceptance of the bargain before the plea is accepted. In the federal courts, plea bargaining is governed by Rule 11 of the Federal Rules of Criminal Procedure, which requires the court to address the defendant personally in open court in order to determine "that the plea is voluntary and not the result of force or threats or promises apart from a plea agreement." Fed. R. Crim. P. 11(d). The rule requires disclosure of a plea agreement in open court, and directs the court, if it accepts the agreement, to inform the defendant that it will embody in the judgment and sentence the disposition provided for by the agreement. Fed. R. Crim. P. 11(e). Finally, the court is required to make "such inquiry as shall satisfy it that there is a factual basis for the plea." Fed. R. Crim. P. 11(f). Most, if not all, state courts have similar procedural requirements. *See, e.g.*, 21 Am. Jur. 2d *Criminal Law* II 470–85; Uniform R. Crim. P. 443 & 444.

We understand concern has been raised that the lack of any comparable procedures or requirements applicable to the negotiation of agreements between OSI and alleged Nazi persecutors could potentially lead to abuses of the process. Procedural rules such as Rule 11 or comparable rules in state courts provide a mechanism to ensure that the plea bargaining process meets constitutional standards, and to provide a complete record at the time the plea was

---

[26] *See Brady* v. *United States*, 397 U.S. at 755–56.

[27] *See Smith* v. *O'Grady*, 321 U.S. at 334.

[28] *See Brady* v. *United States*, 397 U.S. at 750; *Fontaine* v. *United States*, 411 U.S. 213, 214–15 (1973); *Sanders* v. *United States*, 373 U S. 1, 19–20 (1963); *Machibroda* v. *United States*, 368 U.S. 487, 489–90 (1962); *United States* v. *Briscoe*, 432 F.2d 1351, 1353 (D.C. Cir. 1970).

[29] *See Henderson* v. *Morgan*, 426 U.S. 637, 638 (1976).

233

entered of the factors relevant to the voluntariness determination. *See Halliday* v. *United States*, 394 U.S. 831, 832 (1969). However, the particular procedures embodied in those rules are not constitutionally mandated, *see McCarthy* v. *United States*, 394 U.S. 459, 465 (1969); *Waddy* v. *Heer*, 383 F.2d 789, 794 (6th Cir. 1967), *cert. denied*, 392 U.S. 911 (1968), and they do not address the substantive determination that must be made as to the voluntariness of a guilty plea. Further, expatriation in general does not necessarily require judicial proceedings, but rather entails an administrative finding that loss of citizenship has occurred. *See* 3 Gordon & Rosenfield § 20.1. Congress has by statute provided for judicial review of that administrative determination in 8 U.S.C. § 1503, but the process does not, unlike the acceptance of guilty pleas in criminal cases, necessarily require a judicial determination at the time the expatriating act is committed that the act was committed voluntarily.

Therefore, we do not believe that the lack of any specific procedural safeguards renders the agreements reached between OSI and Mr. A and Mr. B invalid or undercuts the relevance of the substantive analysis by the courts of the voluntariness of criminal plea bargains. We would be somewhat more concerned about the lack of procedural safeguards if the individuals could not obtain judicial review at some point of the voluntariness of their renunciations. As we pointed out above, however, current State Department regulations provide for administrative review of any determination of loss of citizenship, and an opportunity for judicial review is provided by statute.

In that regard, we are unsure as to the effect of the undertaking in Mr. A's and Mr. B's agreements that they would not institute any actions to challenge the basis for the agreements or their renunciations. Given the importance of the constitutional right at stake, and the absence of particular procedural safeguards applicable to negotiation of the agreements, we are not certain that such an undertaking would be held enforceable in court.[30] Because a resolution of that question is not necessary to this opinion, we do not attempt to resolve it here.

### D. *Voluntariness of Renunciations by Mr. A and Mr. B*

We believe that the analysis of the voluntariness issue in the plea bargain cases is substantively consistent with the voluntariness standard articulated in *Afroyim* v. *Rusk*, particularly as that standard was interpreted in *Jolley* v. *Immigration & Naturalization Service*. The emphasis in both instances is on whether the individual could reasonably choose between alternatives, however difficult that choice might be and whatever the individual's motivation might be for making the choice. The plea bargain cases establish that a choice such as that faced by Mr. A and Mr. B — between waiver of constitutional rights and prosecution — can be voluntary, if intelligently made by a competent individual. Here, both men had substantial interests in avoiding the expense, strain, and publicity of deportation and denaturalization proceedings. In addition, they

---

[30] *See, e.g., Halliday* v. *United States*, 394 U.S at 833 (noting importance of availability of post-conviction remedy to challenge voluntariness of plea bargain); *see also Fontaine* v. *United States*, 411 U.S. at 215 (coerced guilty plea is open to collateral attack)

had an interest in avoiding other consequences or sanctions that might flow from denaturalization and deportation, such as the possible loss of federal benefits accrued while they were citizens. The facts available to us indicate that counsel for Mr. A and Mr. B reviewed the evidence and were involved in the discussions, that Mr. A and Mr. B were informed, either by OSI or through counsel, of the charges and evidence against them, that they were informed of the consequences of their action both at the time they signed the agreements and at the time they executed the oaths of renunciation, that both admitted in the agreements that they had been involved in Nazi activities and that they were subject to denaturalization and deportation, and that both repeatedly acknowledged the voluntariness of their acts.

Although Mr. B has since professed his innocence of the charges against him, OSI has informed us that it has substantial evidence supporting those charges, much of it from statements made under oath by Mr. B. Under *North Carolina* v. *Alford*, 400 U.S. at 37, therefore, it would not appear that his later self- serving statements undercut the voluntariness of his renunciation. In addition, as far as we know the only threat made by OSI prosecutors in the bargaining process was the threat to institute denaturalization and deportation proceedings, with whatever consequences might flow from those proceedings. Because OSI believed it had developed facts that would warrant such proceedings, that threat cannot be viewed as illegitimate or overreaching.

At least in the absence of other facts indicating that government prosecutors engaged in misrepresentation or illegitimate threats, or that Mr. A and Mr. B were not fully informed of the nature of the charges against them or the consequences of their plea — none of which is suggested in the material we have reviewed — and based on the facts as they have been presented to us, we are confident that a court would find that both renunciations were voluntary. In reaching that conclusion, we believe that the courts would find relevant, as we have, the clear analogy between these agreements and plea bargains, and therefore apply the well-established principles applicable to the determination of voluntariness in that context. *See generally United States* v. *Ryan*, 360 F. Supp. 265, 270 (E.D.N.Y. 1973) (noting analogy between plea bargains and consent judgment entered in denaturalization case requiring renunciation of citizenship by subject of proceedings).[31]

RALPH W. TARR
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[31] Although we believe the courts would certainly find the plea bargain analogy relevant, they might not feel bound by the strict scrutiny generally given to criminal pleas Denaturalization and deportation proceedings are civil rather than criminal in nature, *see, e.g., Harisiades* v. *Shaughnessy*, 342 U.S. 580 (1952); *Bugajewitz* v. *Adams*, 228 U.S 585 (1913); *United States* v. *Stromberg*, 227 F 2d 903 (11th Cir. 1955), and proceedings relating to expatriation are clearly civil in nature, *see* 8 U.S C. § 1503. Although the consequences of denaturalization and deportation or voluntary expatriation are severe, they do not involve a loss of liberty or criminal punishment. In addition, in any challenge to the loss of citizenship the burden would be on Mr. A or Mr. B to rebut the presumption of voluntariness that flows from § 1481(c). Therefore, it may be that courts would not scrutinize bargains struck in the context of expatriations by renunciation of citizenship as closely as they generally scrutinize criminal plea bargains.

235